MAKINO, U.S.A., INC. *vs.* METLIFE CAPITAL CREDIT
CORPORATION & another.[1]

No. 86-1240.

Middlesex.   October 9, 1987. — January 21, 1988.

Present: ARMSTRONG, DREBEN, & KASS, JJ.

*Consumer Protection Act,* Businessman's claim, Exemption from liability,
   Interstate transaction, Damages. *Practice, Civil,* Consumer protection
   case, Findings by judge, Appeal, Summary judgment, Judicial discre-
   tion, Instructions to jury. *Agency,* Scope of authority or employment.
   *Corporation,* Officers and agents. *Fraud. Evidence,* Best and secondary,
   Bias, Relevancy and materiality. *Rules of Civil Procedure. Damages,*
   Consumer protection case, Mitigation, Interest. *Interest. Words,*
   "Primarily and substantially within the commonwealth."

A concerted course of deceptive conduct in which the area branch manager
   of a Massachusetts-based finance company participated from the com-
   pany's Boston office in arranging financing for the sale of a so-called
   "machining center" by a Japanese corporation's Chicago-based dis-
   tributor which then led to the machine's delivery to its buyer in Massa-
   chusetts and the manager's improper disbursement of funds to pay for
   the machine, comprised activities occurring "primarily and substantially
   within the commonwealth," and thus the finance company was not
   exempt under G. L. c. 93A, § 3(1)(b), as appearing in St. 1967, c. 813,
   § 1, from the consumer protection claims made by the distributor in an
   action against the finance company. [308-311]
In an action against a finance company by the distributor of a so-called
   "machining center" financed through arrangements made by one of the
   defendant's area branch managers whose concerted course of deceptive
   conduct resulted in the improper disbursement of funds to pay for the
   machine, the evidence was sufficient to establish that the branch manager
   had actual or apparent authority to make the ordinary financing arrange-
   ments involved in this transaction and that, consequently, the defendant
   was responsible for its manager's deceptive acts. [312-313]
In an action against a finance company by the distributor of a so-called
   "machining center" financed through arrangements made by one of the
   defendant's area branch managers whose concerted course of deceptive

[1] William J. Terry.

conduct resulted in the improper disbursement of funds to one of the plaintiff's dealers, there was no merit to the defendant's contention that the evidence established that the dealer had apparent authority to receive the funds. [314]

There was no merit to a contention by the defendant in a civil action that the judge's findings of fact, adopted largely from proposed findings submitted by plaintiff's counsel, were clearly erroneous, where the judge's findings were supported by evidence in the record and bore the stamp of his independent judgment. [314-315]

At the trial of a civil action, the judge did not abuse his discretion in admitting in evidence a photostatic copy of pages of a certain ledger sheet. [315]

The judge at the trial of a civil action did not err in excluding evidence of earlier litigation between the parties in a Federal court offered by the defendant to support, among other things, its proposition that a certain witness was biased in the plaintiff's favor, where nothing in the proffered testimony suggested the witness notably favored the plaintiff, and where there was no other evidence presented that the witness might be biased. [315-316]

At the trial of an action by a distributor of a so-called "machining center" against a finance company arising from the defendant's area branch manager's improper disbursement of funds supplied in a financing arrangement for the machine's sale, the judge did not err in excluding evidence proffered by the defendant seeking to demonstrate that its manager did not have check writing authority, presumably, to show the limited authority which the manager enjoyed, where there was no suggestion that the manager had issued any improper checks, and where his lack of such authority, which would have been known only to him and his employer, had little bearing on how third parties would perceive the scope of his authority. [316]

At the trial of an action by a distributor of a so-called "machining center" against a finance company arising from the defendant's area branch manager's improper disbursement of funds supplied in a financing arrangement for the machine's sale, the judge did not err in permitting the plaintiff to introduce in evidence two documents which, the defendant alleged, did not accurately reflect the transaction as it was ultimately shaped, where the defendant had not withdrawn the documents during the course of its business dealings with the plaintiff and where at least one of the documents permitted inferences about the role the defendant's manager played in the transaction. [316]

At the trial of an action by the distributor of a so-called "machining center" against the finance company which arranged the financing for a sale of the machine, the judge did not err in excluding evidence of defects in the machine, offered by the defendant to reduce its damages, where the proffered evidence was relevant only if the plaintiff sought to prove that

the defendant's role was in fact that of a buyer of the machine, a theory on which the case was not tried since there was no question that the defendant's role was that of financier, rather than buyer. [316-317]

It was within the discretion of the judge in a civil action to excuse a party's failure to serve its motion for summary judgment upon the opposing party ten days before the time fixed for hearing, as required by Mass.R.Civ.P. 56(c), where it did not appear that the opposing party had been handicapped thereby. [317-318]

At the trial of a civil action the judge correctly ordered entry of summary judgment in favor of the plaintiff on so much of the defendant's counterclaim as alleged that, by having previously commenced a virtually identical Federal court action which had been dismissed for lack of diversity jurisdiction, the plaintiff had tortiously interfered with the defendant's contractual relations, abused process, and sought to inflict inconvenience on the defendant, where, although the plaintiff's motion was brought forward in the middle of a jury trial, the judge could properly conclude, for summary judgment purposes and without weighing evidence or assessing credibility, that the Federal action had had a bona fide basis, rather than any of the unjustifiable or ulterior bases alleged. [318-319]

In the circumstances of a dispute arising out of a business transaction in which an area branch manager of a finance company arranged the financing for the distribution of a so-called "machining center" which led to the improper disbursement of funds by the branch manager, the distributor of the machine did not unreasonably fail to mitigate damages in its action against the finance company by its decision to return an uncertified check, covering one-half the sale price of the machine, which it received from an unexpected source some time after the improper disbursement of funds had become known. [319]

A plaintiff seeking to recover under the multiple damages provisions of G. L. c. 93A, § 11, was not entitled to prejudgment interest under G. L. c. 231, § 6B, on the punitive damages component of the judgment awarded in its favor. [320-321]

In an action against a finance company by the distributor of a so-called "machining center" financed through arrangements made by one of the defendant's area branch managers whose concerted course of deceptive conduct resulted in the improper disbursement of funds to one of the plaintiff's dealers, the judge was not obliged to reduce the plaintiff's damages by the amount due the dealer as a commission for selling the machine, where there was no indication in the evidence that the dealer was entitled to any payment from the plaintiff. [322]

In response to questions from jurors, the judge in a civil action properly reinstructed them on the meaning of a certain legal terms, and was not required to restate all the factual contexts to which the jury had to apply the terms about which they had inquired. [322]

CIVIL ACTION commenced in the Superior Court Department on August 20, 1982.

The case was tried before *Andrew Gill Meyer, J.*

*Brian W. LeClair* (*Robert C. Cadle* with him) for Metlife Capital Credit Corporation.

*Joseph D. Steinfield* (*Frances S. Cohen* with him) for the plaintiff.

KASS, J. On January 20, 1981, Makino, U.S.A., Inc., a distributor for its Japanese parent, delivered a "machining center" — it made parts for other machines — to Richard C. Moran, who operated a machine shop in Everett. The purchase price was $187,223. Moran, the buyer, paid for the Makino machine through financing arrangements with Litton Industries Credit Corporation (Litton).[2] Litton disbursed the actual dollars not to Moran or Makino, but to Kensington Associates, Inc. (Kensington), a dealer for Makino. Kensington never remitted to Makino, thus setting the stage for the dispute between Makino and Litton, one between relative innocents in that Kensington or its sole stockholder, William J. Terry, pocketed the money. Neither Kensington nor Terry, apparently, can satisfy a judgment (see note 3, below).

On the basic common law claims, a jury returned a verdict for Makino against Litton of $186,653, i.e., Litton's conduct had engineered delivery of the machine and misdelivery of the funds. A judge of the Superior Court, dealing with aspects of Makino's complaint made under G. L. c. 93A, doubled the damages and awarded attorney's fees of $244,000. After prejudgment interest and costs were added, the judgment entered against Litton came to $715,440.09. Litton appeals.[3]

It is readily apparent that the c. 93A components constitute the major portion of Makino's judgment. A primary question to be resolved, therefore, is whether a c. 93A claim can lie

---

[2] During the course of the litigation Litton Industries Credit Corporation changed its name to Metlife Capital Credit Corporation.

[3] Substantial judgments entered for Makino against Kensington and Terry ($902,093.09) and for Litton against Kensington and Terry ($772;755.04). Kensington and Terry did not perfect their appeals. The judgments against them appear to be uncollectible.

under the facts presented. We state those facts, based on the trial judge's findings, with occasional supplementation from undisputed portions of the record.

Moran became interested in the Makino MC-60 machine at a trade show in Chicago. In response to a business card he had left as an expression of that interest, Moran heard from a Makino dealer located in Peabody. That dealer was Kensington, operating through its president and sole stockholder, Terry. Hard upon Terry's visit to Moran's shop there followed an unsolicited call from Richard Hughes, the manager of Litton's Boston area office. Hughes turned up on Moran's doorstep to explore prospects for having Litton finance Moran's acquisition of the Makino machine.

Litton offered to give an equipment lease or to advance money to have Moran buy the machine in return for a note and a security agreement. Moran preferred the latter, i.e., an outright purchase, so that he might reap an investment tax credit. Indeed, Moran wanted to take the credit beginning in 1980, although the machine could not be delivered until some time in January, 1981. This was a problem that Hughes thought they could "work around."

The solution contrived was to have Moran sign and deliver to Hughes on December 4, 1980: (1) a promissory note for $166,223, the amount borrowed; (2) a security agreement giving Litton a security interest in the machine; (3) a Uniform Commercial Code financing statement; (4) a "pay proceeds letter" which directed Litton to pay the proceeds of the loan plus $21,000 of "front money" advanced by Moran to Kensington; and (5) an "acceptance certificate" that acknowledged the machinery had "in fact been received" by Moran. That same day Moran signed a purchase order for the machine, directed to Kensington, which stated the machine was "wanted" on January 12, 1981. Moran and Hughes recognized that the simultaneous order and receipt of a large machine with a $187,223 price tag was likely to tax even a willing suspension of disbelief. The pay proceeds letter and acceptance certificate were, therefore, dated December 22, 1980. If the papers were less palpably false, the idea seemed to be, they would be more credible.

Moran suffered a pang of doubt. The machine had to come from Japan. What if the ship should sink? Hughes reassured Moran that the check would not be cashed nor the papers released until the machine was delivered to Everett and installed. Hughes found his promise inexpedient and promptly sent Moran's $21,000 check to Litton's regional office in Stamford, Connecticut, and the check, as promptly, bounced because Moran had seen no need to cover it immediately.

On December 22, 1980, before the machine arrived in the United States, and, indeed, before Makino had approved Moran's purchase order, Hughes surrendered Moran's financing documents to Terry, who had come to Hughes's house for the purpose. Hughes further accommodated Terry by telephoning Litton's regional office in Connecticut and directing that the loan proceeds be paid to Terry upon receipt of the financing documents. Terry drove to Stamford the next day, delivered the papers and received Litton's check for $187,223.

Up to this point the actual vendor was relegated to the periphery. Not until a week later, on December 30, 1980, did Terry travel to Chicago and present Moran's purchase order to Makino at the latter's office. Makino declined to accept the purchase order because it ran to Kensington as vendor. There had been too many instances of failure by Kensington to remit sale proceeds. Makino insisted upon a purchase order from Litton running directly to it. Terry solved the purchase order problem in part by pasting a Makino label over Kensington's name on the purchase order and resubmitting it. Suffice it to say, Terry did not inform Makino that the money had already passed into his hands.

Makino's vice-president, Hiromi Osumi, attempted to reach Hughes (whose name he had obtained from Terry's secretary). Osumi's secretary placed calls to Hughes on January 13th at 10:55 A.M. and 12:17 P.M. Hughes returned the call to Osumi at 2:09 P.M but Hughes first called Terry twice, at 11:45 A.M. and at 2:01 P.M. The later call lasted for six minutes. In the ensuing telephone conversation with Osumi, Hughes said he understood Makino was the vendor and assured Osumi that Litton would pay Makino directly for the machine to be shipped

to Moran. Hughes withheld from Osumi the critical information that Terry had received the cash for the machine weeks before. Telephone calls by Hughes to Makino made on January 14th and 20th reinforced: (1) the cover up about where the cash supplied by Litton had come to roost and (2) the proposition that Litton would pay Makino. Throughout this period Hughes kept Terry informed about his conversations with Osumi. There were to be no embarrassing slips.

On January 20, 1981, the machine arrived at Moran's shop. Osumi put a call in to Hughes. Once again Hughes took the precaution of first talking to Terry before calling Osumi back. In that conversation Hughes confirmed that Litton would pay Makino when Moran signed an acceptance certificate signifying completion of installation. That was doubly misleading: first, as to where the loan funds were and, second, in failing to disclose that Litton had been in possession of an acceptance certificate for almost two months.

In February, 1981, as Makino pressed for payment, the facts of the affair unravelled.

1. *Availability of relief under c. 93A.* An action under G. L. c. 93A does not lie — and did not lie when the salient events occurred — unless the actions or transactions claimed to violate c. 93A occurred "primarily and substantially within the commonwealth." G. L. c. 93A, § 3(1)(b), as appearing in St. 1967, c. 813, § 1, and see G. L. c. 93A, § 11, as amended by St. 1986, c. 363, § 4.[4] See *Burnham* v. *Mark IV Homes, Inc.,*

---

[4] There has been considerable recent legislative activity about the subject of exemption from the potent remedies of c. 93A. Under G. L. c. 93A, § 3, from 1967 to 1983, i.e., during the period in which the acts complained of in the instant case transpired, c. 93A did not apply to "trade or commerce of any person of whose gross revenue at least twenty percent is derived from transactions in interstate commerce, excepting however transactions and actions which (i) occur primarily and substantially within the commonwealth. . . . " That provision was eliminated by St. 1983, c. 242, which rewrote G. L. c. 93A, § 3, so that the only exempt category consisted of "transactions or actions otherwise permitted under laws as administered by any regulatory board or officer acting under statutory authority of the commonwealth or of the United States." The general availability of c. 93A relief was then narrowed by St. 1985, c. 278, § 3, as to so-called "business consumer protection actions" under § 11 of c. 93A. The 1985 act added a

387 Mass. 575, 580 (1982); *Bushkin Associates, Inc.* v. *Ray-theon Co.*, 393 Mass. 622, 637-639 (1985); *Goldstein Oil Co.* v. *C. K. Smith Co.*, 20 Mass. App. Ct. 243, 246 (1985).

Litton urges that the only acts by Hughes (we consider later whether Litton is bound by Hughes's conduct) which were deceptive were his statements on January 13, 1981, over the telephone from Wakefield (where Litton's area office was located) to Makino in Chicago. Were that all, the case would stand close to *Bushkin Associates, Inc.* v. *Raytheon Co.*, 393 Mass. at 638, in which a Raytheon officer, sitting in Massachusetts, allegedly made false statements in a telephone conversation to Bushkin in New York. Those statements caused Bushkin to provide business information useful to Raytheon. The unfair or deceptive statements were received and acted upon in New York and Bushkin's loss, if any, was incurred in New York. In such circumstances, the court held, the defendant had met its burden of showing that acts violative of the statute had not occurred primarily or substantially in Massachusetts. *Ibid.* By analogy, Litton argues, Makino incurred a loss when, on the basis of Hughes's misrepresentations, it acted outside Massachusetts by shipping the machine to Moran.

It reads too much into the *Bushkin* opinion to have it stand for the proposition that the place of injury or loss determines whether actions or transactions occurred primarily and substantially within the Commonwealth. Rather, the decision in *Bushkin* flowed from the scantiness of activity in Massachusetts, including sustaining of the loss. As we observed in *Goldstein Oil Co.* v. *C. K. Smith Co.*, 20 Mass. App. Ct. at 249 n.7, if the place of injury were the only test, practically no case involving a Massa-

provision to § 11 that "[N]o action under the provisions of this section [i.e., § 11] shall be brought or maintained in any court unless the parties to such action have a place of business in the commonwealth at the time the unfair method of competition, act or practice is employed." A year later, the Legislature seems to have repented of having narrowed the category of § 11 actions and by St. 1986, c. 363, substituted the following: "No action shall be brought or maintained under this section unless the actions and transactions constituting the alleged unfair method of competition or the unfair or deceptive act or practice occurred primarily and substantially within the commonwealth." As to § 11 actions, therefore, the standard of exemption has come substantially full circle.

chusetts plaintiff would be exempt from c. 93A status, no matter how negligible the defendants' business activity in this State. Such a result would effectively nullify the words "primarily and substantially within the commonwealth," which imply some process of measuring and weighing. Accordingly, the court in *Goldstein,* at 248-250, inquired whether the conduct said to offend the statute occurred in Massachusetts. So little, the court determined in *Goldstein,* had occurred in Massachusetts — one and six-tenths percent of the transactions complained of — that the defendant-in-counterclaim's burden of establishing exemption was carried.

In the case before us a good deal more happened than a single telephone call from Wakefield to Chicago. There was a concerted course of deceptive conduct in which Hughes participated in Massachusetts which led to the delivery of the machine and the misdelivery of the money. See *International Fid. Ins. Co.* v. *Wilson,* 387 Mass. 841, 849 (1983). There was a "causal connection between the deception and the loss and . . . the loss was foreseeable as a result of the deception." *Id.* at 850.

The first deceptive step in Massachusetts was the falsification by Hughes of the financing papers, particularly of the "pay proceeds letter" and the "acceptance certificate," documents expressly calculated to release funds. Next came the meeting in Massachusetts between Terry and Hughes at which Hughes delivered to Terry the financing papers — not merely incidentally in breach of his word to Moran — for delivery to Litton's regional office in Stamford. That act insured the premature delivery of funds to Kensington. Later, when called by Makino, Hughes first took care to confer telephonically in Massachusetts with Terry to be certain that he and Terry would take a consistent line with Makino. So it was that Hughes assured Makino that Litton understood Makino was the vendor and that Litton would pay Makino directly.

Throughout the first three weeks of January, Hughes talked with Terry frequently in Massachusetts. During the same period, by telephonic communications to Makino, Hughes continued to cover up the decisive information that the loan pro-

ceeds were in the hands of Kensington. His purpose was to cause the machine to be shipped to Massachusetts. When it arrived in Everett, Hughes visited Moran's shop and saw the machine in its crate. Makino's engineers had not yet come to install the machine and, thus, complete delivery. Hughes continued to withhold information which he knew was vital to Makino and which was contrary to what he had represented to them.

Unlike the single telephone call upon which the *Bushkin* case concentrates, a series of actions took place in Massachusetts in connection with a transaction that originated in Massachusetts and called for the delivery and installation of a machine in Massachusetts. Litton argues that, with the exception of the telephone calls by Hughes with Makino, his deceptive conduct struck at Litton, whose money was untimely disbursed and not secured, and at Moran, who had not received the machine. It is an argument that at first seems plausible but requires looking at Hughes's acts of deception in isolation, rather than in the context of the over-all transaction. Practical sense dictates otherwise. See *International Fid. Ins. Co.* v. *Wilson,* 387 Mass. at 849.

In concluding that the actions and transactions complained about by Makino occurred primarily and substantially in Massachusetts, we have considered that the preponderance of the wrongful conduct occurred in Massachusetts and that the essential elements of the transaction — the sales, the financing deal, and the delivery of the machine — took place in Massachusetts. Perhaps that is a "functional approach" in that it responds to the statutory concern with commercial conduct in Massachusetts. See *Bushkin Associates, Inc.* v. *Raytheon Co.,* 393 Mass. at 630-636 and 638-639. In *Bushkin,* the court said that it did not need to decide whether a "functional approach" was a proper one because the court was able to conclude that the paucity of Massachusetts conduct was unmistakeable. *Id.* at 638-639. Here the factors are more complex, and the process of measuring and weighing, which flows from the words "primarily and substantially," is more identifiable — although not fundamentally different from the analysis the courts were required to perform in *Bushkin* and *Goldstein.*

2. *The scope of Hughes's agency.* Litton is responsible for Hughes's deceptive acts if they were within his actual authority, implied authority, or apparent authority, or, if not within Hughes's authority, were ratified by Litton. The jury's general verdict, by implication, and the judge's findings (on the c. 93A aspects of the case), expressly, resolved the agency question adversely to Litton. The error asserted by Litton is that the judge did not allow its motions for a directed verdict or its motion for judgment notwithstanding the verdict. Our inquiry is whether, considering the evidence in a light most favorable to Makino, without weighing the credibility of the evidence or otherwise considering its weight, the finder of fact could reasonably resolve the agency question in Makino's favor. See *Kanavos* v. *Hancock Bank & Trust Co.,* 14 Mass. App. Ct. 326, 327 (1982); *Rubel* v. *Hayden, Harding & Buchanan, Inc.,* 15 Mass. App. Ct. 252, 254 (1983).

There was evidence that Hughes was Litton's Boston area branch manager. That office was less lofty than it sounds — the Boston branch consisted of two persons and a part-time secretary. Yet a sales manual received in evidence recited that the branch manager "[s]upervises the activities of the Branch office in order to achieve optimum exploitation of the potential market for installment and leasing sales in his assigned territory." After a listing of specific tasks the manual enumerates "other duties," concluding with: "Has complete responsibility for branch operation." A trier of fact could, thus, conclude that Litton conferred upon its branch managers plenary authority to do what needed to be done to make a deal, leaving it to the regional office to check credit and confer approval. Although formally exercising a supervisory function, the regional office gave Hughes considerable scope. It took his direction on payment to Terry; it acceded again to Hughes's direction for handling the transaction even after learning — through an inquiry about insurance — that the machine had not arrived in Everett.

Hughes surely did not have authority to defraud his own company. That, however, was not his purpose. His purpose was to get the transaction on the books, an end which was

within his authority, although he pursued that end unwisely and too well. Parties dealing with Litton through Hughes were entitled to rely on his representations made in the ordinary course of equipment financing. The authority conferred upon Hughes cloaked him with certain apparent authority. What Hughes did — falsifying dates, releasing the loan funds before the security for the loan had arrived, misstating facts, withholding obviously important information — was extraordinary, but what he represented to Makino was ordinary, even routine. From Makino's vantage there was nothing extraordinary about having Hughes represent that he understood Makino was to be the vendor and that the loan funds were to be paid directly to it upon delivery of the machine.

Based upon the position and authority vested in Hughes, Makino might reasonably expect he could make ordinary commercial arrangements. See *Costonis* v. *Medford Housing Authy.*, 343 Mass. 108, 113-115 (1961); *Hudson* v. *Property Ins. Underwriting Assn.*, 386 Mass. 450, 457 (1982); *Weisman* v. *Saetz*, 11 Mass. App. Ct. 440, 442 (1981); *Kanavos* v. *Hancock Bank & Trust Co.*, 14 Mass. App. Ct. at 311; *Greenstein* v. *Flatley*, 19 Mass. App. Ct. 351, 355-356 (1985). Restatement (Second) of Agency §§ 8, 27, 49 (1958). Particularly when a company, such as Litton, does business on a national basis (it has some forty offices), it is reasonable to deal with the person apparently in charge at the site of the loan transaction. The fraud perpetrated by Hughes on Makino was in his interest and his employer's — so he might think, i.e., if the machine were shipped and installed, Litton would have its security and the money might in the end be pried from Kensington.

Generally, the fraud of an agent acting in the course of his employment binds his principal. *Bockser* v. *Dorchester Mut. Fire Ins. Co.*, 327 Mass. 473, 477 (1951). *Cellucci* v. *Sun Oil Co.*, 368 Mass. 811, 812 (1975). Liability results if "the agent's position facilitates . . . the fraud, in that from the point of view of the third person the transaction seems regular on its face and the agent appears to be acting in the ordinary course of the business confided to him." Restatement (Second) of Agency § 261 comment a (1958).

Litton makes an apparent authority argument of its own, namely, that Terry appeared to be authorized to receive payment on Makino's behalf. It is not necessary to sift the evidence for support of this proposition. There was certainly no authority to disburse money to Terry or his company before the machine arrived. Well before the machine was shipped, Makino had said expressly that payment for the machine was to flow directly to it.

3. *Independence of judge's findings.* Whenever a trial judge adopts verbatim findings suggested by one side, a gnawing doubt arises about how much the judge injected his own intelligence into the process. See *Cormier* v. *Carty,* 381 Mass. 234, 236-237 (1980); *Lewis* v. *Emerson,* 391 Mass. 517, 524 (1984); *Markell* v. *Sidney B. Pfeifer Foundation,* 9 Mass. App. Ct. 412, 416-418 (1980), and cases cited therein; *Edinburg* v. *Cavers,* 22 Mass. App. Ct. 212, 218-219 (1986). In this case, the first 37 numbered paragraphs of the findings track those proposed by Makino. Of the remaining nine numbered paragraphs, the source material for much of them is readily discoverable in the Makino requests, although the order and choice of material has been somewhat altered. The cases cited above, while sounding a cautionary note, do not announce that copying liberally from a set of proposed findings is tantamount to reversible error. There remains the fundamental question whether the judge's findings of fact pass the "clearly erroneous" test of Mass.R.Civ.P. 52(a), 365 Mass. 816 (1974). *Edinburg* v. *Cavers,* 22 Mass. App. Ct. at 218-219.

The judge's findings in this case have support in the record. That record discloses that the judge was fully engaged in the proceedings. We have the benefit of the judge's instructions to the jury. The factual resolution of Makino's claims of negligent misrepresentation or fraud by Litton parallel those involved in the c. 93A claim. It is apparent that the judge had the questions squarely in mind. In such circumstances, the degree to which he leans on answers furnished by a party becomes less important. Whether a finding of fact is clearly erroneous is not a function of diction or style. Finally we take into account that the judge entered his written findings of fact

within six weeks of the end of the trial. His memory would have been fresh. Coupled with manifestations of engagement in the case, we are satisfied that the findings bear the stamp of the judge's intelligence.

As the judge's findings have evidentiary support, they are proof against Litton's assault on them as clearly erroneous unless, on the entire evidence, we are left with the firm conviction that a mistake has been committed. *Building Inspector of Lancaster* v. *Sanderson,* 372 Mass. 157, 160 (1977). Our review of the record does not leave us with such a conviction.

4. *Evidentiary questions.* (a) At trial, Makino, over Litton's objection, introduced a photocopy of pages of a ledger to support Makino's contention that it had applied certain funds received from Terry to an open account, rather than to the amount due on account of the machine shipped to Moran. Litton's ground of objection was that the best evidence rule required Makino to produce the original in the absence of a sufficiently brilliant excuse for not producing the real item. It may be enough to say that the best evidence rule is a preferential rather than an exclusionary one. *Fauci* v. *Mulready,* 337 Mass. 532, 540-542 (1958). Liacos, Massachusetts Evidence 373 (5th ed. 1981). There is considerable discretion in the trial judge to determine when it is more likely than not that the original exists or existed and that there was no culpability attendant upon failure to produce the original. See *Buker* v. *Melanson,* 8 Mass. App. Ct. 325, 330-331 (1979). Litton's objection became still less potent when, on the next day of trial, it developed that the original ledger pages had been made available to Litton during the course of discovery. There was no error in admitting copies of the ledger sheets.

(b) An action brought by Makino in Federal court in Chicago had been voluntarily dismissed for lack of diversity of citizenship. That action had included Moran. Litton wanted to introduce evidence of the earlier litigation to support, among other things, its proposition that Moran was a witness biased in Makino's favor. Study of Moran's testimony, which was obtained by subpoena, does not suggest a witness notably favorable to Makino. There was no other evidence that Moran might

be a biased witness. The line of questioning was, in the judge's discretion, properly excluded.

(c) The judge was entitled to exclude questions seeking to bring forth that Hughes did not have check writing authority. The point is, presumably, that this want of authority demonstrated the limited authority which Hughes enjoyed. There was no suggestion that Hughes had issued any improper checks. His lack of check writing authority, which would be known only to him and his employer, had little bearing on how third parties would perceive the scope of his authority. There was no error in exclusion of that proffered evidence.

(d) Over objection, the judge permitted Makino to introduce a purchase order by Litton for the machine and a so-called "abandonment letter"[5] by which Litton, redundantly, stated that when Moran's company had completed all performance of its obligations under its security agreement with Litton, the latter abandoned all interest in the machine. Litton's complaint is that neither document accurately reflects the transaction as it was ultimately shaped. The documents were not, however, withdrawn and, at least from the abandonment letter, one could draw inferences about the role Hughes played. Among the more than 100 exhibits received, it is not likely these would have altered Litton's· position.

(e) Litton offered evidence of defects in the Makino machine furnished to Moran. The desired effect of that evidence was to reduce Litton's damages, i.e., if Moran could get part of the purchase price back, Litton's obligations on account of the machine ought to be reduced pro tanto. The proffered evidence, which the judge excluded, was relevant only if Makino sought to prove that Litton was in fact the customer for the machine. That was not a theory on which the case was tried; indeed, Makino disclaimed that approach, and the judge did not put the case to the jury on that theory. Insofar as Makino proceeded on a contract theory, the agreement which Makino sought to prove was that Litton had, in return for shipment of the machine

---

[5] The "abandonment letter" was received twice, with a variation not here material.

to its customer, agreed to remit the loan proceeds and Moran's front money directly to Makino. There was no confusion that Litton's role was that of financier rather than a buyer of a machine.

5. *Summary judgment in mid-trial.* At the conclusion of Makino's direct case as plaintiff, Litton moved for a directed verdict, a motion which was denied. Thereupon Makino made an oral motion for summary judgment as to three counts in a counterclaim which Litton had filed. The motion was allowed as to counts one and two in the counterclaim and as to a particular paragraph in count six. What was, thus, removed from the case had to do with the earlier action brought by Makino in the Federal District Court in Chicago, which, it will be recalled, was dismissed because of imperfect diversity of citizenship. Litton had alleged in its counterclaim that the Chicago action: (1) had tortiously interfered in contractual relations between Litton and Moran (the latter had found it expedient to stop paying Litton when he learned the borrowed money never reached the intended source); (2) constituted an abuse of process; and (3) was unfair (and hence violative of c. 93A) because lodged in an inconvenient place.

When Makino brought forward its motion for summary judgment after the judge had acted on Litton's motion for a directed verdict, Litton protested it had not received the ten-day notice prescribed by Mass.R.Civ.P. 56(c), 365 Mass. 824 (1974). Litton presses the point on appeal, but it is a cavil. Trial judges have discretion to forgive a failure to give the prescribed ten-day notice if it is apparent that "the failure does not affect the opposing party's opportunity to develop and prepare a response." *USTrust Co.* v. *Kennedy,* 17 Mass. App. Ct. 131, 135 (1983), and cases cited. See also *Chongris* v. *Board of Appeals of Andover,* 17 Mass. App. Ct. 999, 1001 (1984). Review of the record leaves no doubt that counsel on both sides were exceptionally well prepared in all facets of the case. They had also been through exhaustive discovery. Surprise was well-nigh out of the question. Indeed, when obliged to respond to Makino's motion, Litton's counsel argued ably and manifested no sign of having been ambushed.

The judge's decision to hear the motion without formal notice constituted reasonable management of a complex and lengthy trial. To have postponed the question raised by the motion would have run some risk of placing extraneous matter before the jury.

On the merits, Litton argues, the motion should not have been allowed because the judge, at that stage of the trial (it was the fifth day) had heard a great deal of evidence, oral and documentary, and must necessarily have weighed it. See *Attorney Gen.* v. *Bailey,* 386 Mass. 367, 370-371 (1982).[6] Weighing the evidence and assessing credibility, however, were not necessary to acting on the summary judgment motion. It was not controverted that there was a substantial dispute between Makino and Litton; that is what the trial was about. Moreover, the judge had determined in ruling on Litton's motion for a directed verdict that Makino had adduced sufficient evidence to put its claim to a jury. It followed that Makino had a bona fide reason, pursuit of $187,223, rather than unjustifiable or ulterior ones inherent in tortious interference with contractual relations[7] and abuse of process.[8] As we have recently observed, the "standard on a motion for summary judgment is for most purposes identical to that applied to a motion for a directed verdict." *Kaitz* v. *Foreign Motors Inc., ante* 198, 200 (1987). If the judge had a basis — as he did — to determine that Makino's action against Litton was proof against a motion for a directed verdict, he could conclude for summary judgment purposes that the virtually identical action in Chicago had been

---

[6] Testimony received in court may be considered on summary judgment motions, although it is rarely done. See *Fisher* v. *Cash Grocery & Sales,* 316 So.2d 872, 874-876 (La. Ct. App. 1975) (Hood, J., concurring); *Summers* v. *American Reliable Ins. Co.,* 85 N.M. 224, 226 (1973); 10A Wright & Miller, Federal Practice and Procedure § 2723 (1983); Smith & Zobel, Rules Practice § 56.7 (1977).

[7] See *Comey* v. *Hill,* 387 Mass. 11, 19 (1982); *Chemawa Country Golf, Inc.* v. *Wnuk,* 9 Mass. App. Ct. 506, 509-510 (1980); *Powers* v. *Leno,* 24 Mass. App. Ct. 381, 385 (1987).

[8] See *Beecy* v. *Pucciarelli,* 387 Mass. 589, 595 (1982); *Datacomm Interface, Inc.* v. *Computerworld, Inc.,* 396 Mass. 760, 775-776 (1986).

more than a pretext. The choice of venue was not mysterious; Makino's home office was in Chicago.

6. *Mitigation of damages.* Some time after the misdirection of loan funds became known to Makino and Litton, Kensington sent its uncertified check, dated February 20, 1981, in the amount of $93,611.50 to Makino. The check, which reached Makino on February 23, carried on it the notation: "½ Payment Full Retail Makino MC-60 S/N 109." Makino's lawyer sent it back. Litton contends that, to the extent Litton owes Makino the price of the machine, Makino unreasonably failed to mitigate damages by spurning Kensington's check. See *Burnham* v. *Mark IV Homes, Inc.,* 387 Mass. at 586.

At the time, however, the reasonableness of banking Kensington's check (if it turned out to be bankable) must have been less than obvious to Makino's lawyer. Makino, from the outset, had looked to Litton for payment. If it accepted Kensington's tender, would that act be seized upon by Litton as a surrender of the claim against Litton? Would Kensington's check bounce? Would there be a merry chase for the balance of the sales price if Makino accepted Kensington's payment on account? Kensington's promise to pay "next week" and its general credit history with Makino did not inspire confidence. Might it not, in the light of experience, be reasonable for Makino to insist on full payment to avoid finger pointing and delay between Litton and Kensington/Terry. The standard of what is reasonable may shift when prior experience with a person makes a mitigating act seem risky. See *Ellerman Lines, Ltd.* v. *The President Harding,* 288 F.2d 288, 290 (2d Cir. 1961); *Peck Iron & Metal Co.* v. *United States,* 603 F.2d 171, 172-173 (Ct. of Cl. 1979); *Clark Operating Corp.* v. *Yokley,* 120 Misc.2d 631, 633 (N.Y. Civ. Ct. 1983); Restatement (Second) of Torts § 918(2) comment (i). A person whose wrong forces a choice between reasonable but potentially hazardous courses cannot be heard to complain about the wronged party's selection. That selection enjoys wide latitude and is to be respected so long as it is not irrational. McCormick, Damages 133-136 (1935). In the circumstances, Makino could reasonably decline Kensington's check.

7. *Interest on multiple damages component.* The judgment below included interest from the commencement of the action to the date of judgment, calculated on the basic damages, i.e., the $186,653 owed for the machine.[9] That interest came to $80,634.09. Litton's unfair and deceptive conduct, the judge found, was willful. Accordingly, he assessed double damages. Attorney's fees and legal costs aggregated $261,500. The total judgment, as noted at the beginning of this opinion, came to $715,440.09. Makino asked for — and was denied — prejudgment interest on the c. 93A penalty damages, i.e., on the second $186,653. It has claimed a cross appeal on that score.

It is the design of the multiple damages provision of c. 93A to impose a penalty, one which "varies with the culpability of the defendant." *International Fid. Ins. Co.* v. *Wilson,* 387 Mass. at 856-857 and n.21. See also *Heller* v. *Silverbranch Constr. Corp.,* 376 Mass. 621, 627-628 (1978). In the case of the consumer protection law, punitive damages serve the dual purpose of expressing displeasure with the proscribed conduct and providing a goad to settlement. Whether prejudgment interest shall be imposed on the punitive component of a judgment was adverted to obliquely in *Scofield* v. *Berman & Sons,* 393 Mass. 95, 105-106 (1984), but the question had not been raised in the trial court and was, therefore, not considered at the appellate level. Interest appears to have been computed on a multiple damages component in several cases but no issue about the correctness of so doing was raised. See *DiMarzo* v. *American Mut. Ins. Co.,* 389 Mass. 85, 89 (1983); *Doucette* v. *Kwiat,* 392 Mass. 915, 917 (1984); *Patry* v. *Liberty Mobilehome Sales, Inc.,* 394 Mass. 270, 271 (1985). It would read too much into the opinions in those cases to have them stand for a decision on an issue that was not considered.

Prejudgment interest, as is well understood, compensates the prevailing party for loss of the use of money that party,

---

[9] The parties agree that the applicable prejudgment interest provision is G. L. c. 231, § 6B. See *Patry* v. *Liberty Mobilehome Sales, Inc.,* 394 Mass. 270, 271 (1985). The assessment of damages at $570 less than the price of the machine resulted from a credit on account of an accessory to the machine never delivered to Moran.

as determined by the judgment, should have had in the first place and not been obliged to chase. In that way compensatory damages are truly compensatory and, in monetary terms, the winner is no less well off for the chase.[10] See *Bernier* v. *Boston Edison Co.,* 380 Mass. 372, 388 (1980), and cases cited. No similar purpose would be served by imposing interest on punitive damages which, as we have seen, have a purpose beyond restoring to a plaintiff what should have been his. Indeed, to add interest on punitive damages in a c. 93A case would have the flavor of an unseemly piling on. Such is the preponderant weight of authority among courts which have considered the question. *Casto* v. *Arkansas-Louisiana Gas Co.,* 562 F.2d 622, 625-626 (10th Cir. 1977). *Trio Process Corp.* v. *L. Goldstein's Sons,* 638 F.2d 661, 662-663 (3d Cir. 1981). *American Timber & Trading Co.* v. *First Natl. Bank,* 690 F.2d 781, 785-786 (9th Cir. 1982). *Underwater Devices, Inc.* v. *Morrison-Knudsen Co.,* 717 F.2d 1380, 1389 (Fed. Cir. 1983). *United States* v. *McLeod,* 721 F.2d 282, 285-286 (9th Cir. 1983). *Bagley* v. *Iowa Beef Processors, Inc.,* 755 F.2d 1300, 1319-1320 (8th Cir. 1985). *Bailey* v. *Container Corp. of America,* 660 F.Supp. 1048, 1055-1056 (S.D. Ohio 1986). *Andersen* v. *Edwards,* 625 P.2d 282, 289-290 (Alaska 1981). *Coale* v. *Dow Chem. Co.,* 701 P.2d 885, 890 (Colo. App. 1985) (consumer action). *First American Bank & Trust* v. *Windjammer Time Sharing Resort, Inc.,* 483 So.2d 732, 739 (Fla. Dist. Ct. App. 1986). *Ramada Inns, Inc.* v. *Kimberly Sharp,* 101 Nev. 824, 826 (1985). *Cappiello* v. *Ragen Precision Indus., Inc.,* 192 N.J. Super 523, 533 (1984). *Murphy* v. *United Steelworkers of America Local 5705,* 507 A.2d 1342, 1346 (R.I. 1986). *Cavnar* v. *Quality Control Parking, Inc.,* 696 S.W.2d 549, 555 (Tex. 1985). Contra *United States* v. *Cooperative Grain & Supply Co.,* 476 F.2d 47, 62 (8th Cir. 1973); *Greenfield* v. *Spectrum Inv. Corp.,* 174 Cal.App.2d 111, 124 (1985).

8. *Other points.* (a) Litton's argument that the evidence established that Terry had apparent authority to receive the

---

[10] We put aside consideration of legal fees, which are recoverable, of course, in c. 93A actions.

loan funds is, at bottom, a lament that the jury found as it did. (b) The judge was not obliged to reduce Makino's damages by $18,722 because that amount was due Kensington as a commission for selling the machine. Such a reduction might have been in order had Kensington's entitlement to a cash payment from Makino for Kensington's commission been indisputable; Makino was not entitled to a windfall. Here, however, there was evidence that Terry/Kensington for a considerable period had owed Makino $165,165.38 on "open account." The commission on the Moran sale would have been applied in reduction of that balance but Makino would have the benefit of the cash. It was apparent at the time that recovery of the money Kensington owed Makino was going to be slow going. Subsequent events demonstrated that the debt would not be recovered at all. Litton was not entitled to resolve the business questions between Makino and Kensington by directing cash to Kensington. (c) In response to questions from jurors, the judge reinstructed on the meaning of apparent authority, guarantee, contract, fraud, negligent representation, intentional misrepresentation, and indemnification. The judge did so in comparatively concise fashion. He was not required to restate all the factual contexts to which the jury had to apply the terms about which they had inquired.

*Judgment affirmed.*