Connolly, J.
Plaintiff, Compagnie Generale Maritime (CGM), brings this action for indemnity against defendant Central International Company (CIC) claiming that CIC agreed to indemnify CGM fully against all consequences and/or liabilities directly or indirectly related to delivery by CGM of CIC’s goods. CIC brings a counterclaim against CGM alleging fraud, negligence, breach of contract, and violation of G.L.c. 93A. CGM now moves for summary judgment on CIC’s counterclaim on the grounds that G.L.c. 93A is inapplicable and the Bill of Lading provisions and applicable law preclude CIC’s claim for loss or deterioration of product. Based on the following, CGM’s motion is denied in part and allowed in part.
FACTS
CIC is a Massachusetts corporation and CGM is a corporation existing under the laws of France. On December 9, 1989, CGM issued Bill of Lading DNYCA 700 (the bill of lading) for the transport of three containers of frozen mutton carcasses (the cargo) aboard the M/V Montan from Rotterdam, the Netherlands to Vera Cruz, Mexico. The cargo arrived in Vera Cruz on January 2, 1990.
CIC had the cargo shipped to Vera Cruz at the request of its customer, Western Hyde, Inc. According to John Goodfellow (Goodfellow), the Operations Manager for CIC, the deal with Western Hyde “fell through” sometime in February 1990 and CIC attempted to arrange for a second sale to R.W. Meats, Inc. Western Hyde agreed to pay the loss in resale to CIC. R.W. Meats had a Mexican buyer who inspected the cargo in Vera Cruz, and gave a bid for the three containers. In March or April 1990, CIC sold the cargo to R.W. Meats, sent an invoice and was paid $33,000.
At sometime after this sale, CIC received a fax from R.W. Meats, Inc. stating that they could not get the cargo cleared through Mexican customs and they considered the contract rescinded. In a subsequent *99 transaction with CIC, R.W. Meats, Inc. offset the $33,000 which they had paid to CIC for the cargo.
Goodfellow testified at deposition that starting in January 1990, and continuing through June or July 1990, he was informed on many occasions that there was a problem with the permits in regard to getting the cargo into Mexico. Goodfellow stated that the requirements for importing cargo into Mexico are normally taken care of by the Mexican importer and not by CIC. Jose Christian Bennett (Bennett), the General Operations Manager for CGM’s Mexican agent Trans-pac, testified at deposition that Mexican authorities contacted Transpac sometime in April 1990, and informed Transpac that the cargo was considered abandoned and because of public health concerns should be destroyed or shipped out of Mexico.
Bennett testified at deposition that he told Goodfellow that the cargo would be shipped from Mexico to Antwerp in July 1990 and he gave Goodfellow the name of the CGM representative in Rotterdam and Antwerp and the name of the manager to contact in Antwerp. Goodfellow claims, in his affidavit, that he was not notified that the cargo was to be shipped from Vera Cruz to Antwerp until the cargo was already en route to Antwerp.
When CIC had the opportunity to inspect the cargo in October 1990 in Rotterdam, it discovered that the cargo had spoiled and was a total loss. On September 12, 1990, Goodfellow sent a letter of indemnity to CGM which stated that CIC agreed to indemnify CGM against all consequences and/or liabilities of any kind directly or indirectly arising from or relating to delivery of the cargo and on demand against all payments made by CGM in respect of such consequences.
CGM seeks to recover the costs and expenses it allegedly incurred in storing and caring for CIC’s cargo after such cargo arrived in Vera Cruz. CIC states in its answer to CGM’s complaint that “its liability is limited under the terms and conditions of the original Bill of Lading under which the goods were shipped to Vera Cruz, Mexico.” CIC also states in its answer that the “Bill of Lading speaks for itself.”
According to CGM, the Bill of Lading contains the following clauses:[1]
CARRIER’S RESPONSIBILITIES (Port to Port Shipment) where the Carriage called for by this Bill of Lading is a Port to Port Shipment, the liability (if any) of the Carrier for loss of or damage to the goods occurring from and during loading ... up to and during discharge . . . shall be determined ... in accordance with the Hague Rules.
Notwithstanding the above, the Carrier shall be under no liability whatsoever for loss of or damage to the Goods, however occurring, when such loss or damage arises prior to loading on or subsequent to discharge from the vessel. . .
If the delivery of the Goods is not taken by the Merchant at the time and place the Carrier is entitled to call upon the Merchant to take delivery thereof, the Carrier shall be entitled, without notice ... to store the Goods ashore, afloat, in the open or under cover, at the sole risk of the Merchant. Such storage shall constitute due delivery hereunder and thereupon the liabiliiy of the Carrier in respect of the Goods stored as aforesaid shall wholly cease. All the costs so incurred, if paid or payable by the Carrier . .. shall forthwith upon demand be paid by the Merchant to the Carrier.
DISCUSSION
Summary judgment shall be granted where there are no genuine issues as to any material fact and the moving party is entitled to j udgment as a matter of law. Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983); Community Nat’l Bank v. Dawes, 369 Mass. 550, 553 (1976); Mass.R.Civ.P. 56(c). The moving party bears the burden of affirmatively demonstrating the absence of a triable issue, “and [further] that the moving party is entitled to judgment as a matter of law.” Pederson v. Time, Inc., 404 Mass. 14, 1617 (1989). A party moving for summary judgment who does not have the burden of proof at trial may demonstrate the absence of a triable issue either by submitting affirmative evidence that negates an essential element of the opponent’s case or “by demonstrating that proof of that element is unlikely to be forthcoming at trial.” Flesner v. Technical Communications Corp., 410 Mass. 805, 809 (1991); accord, Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991). “If the moving party establishes the absence of a triable issue, the parly opposing the motion must respond and allege specific facts which would establish the existence of a genuine issue of material fact in order to defeat [the] motion.” Pederson, supra, 404 Mass. at 17. “(T]he opposing party cannot rest on his or her pleadings and mere assertions of disputed facts to defeat the motion for summary judgment.” LaLonde v. Eissner, 405 Mass. 207, 209 (1989).
In CIC’s first counterclaim, it alleges that CIC was damaged due to the “faults, failures, fraudulent actions, negligence, and breaches of contract of CGM.” As grounds for this counterclaim, CIC claims that CGM failed to keep the cargo in a refrigerated condition thereby causing spoilage; CGM shipped the cargo to Antwerp without the knowledge, agreement or consent of CIC; and CGM refused to allow CIC to inspect and reclaim its cargo in Antwerp, until after CIC was forced to signed a letter of indemnity under duress.
CIC stated in its answer to CGM’s complaint that its liability is limited under the terms and conditions of the bill of lading. The terms in the bill of lading, referred to by CGM, set forth CGM’s exemption from liability for damage to cargo prior to loading or subsequent to discharge from the vessel. CIC does not specify in its counterclaim whether CGM failed to keep *100 its cargo in a refrigerated condition before, during, or after delivery from Rotterdam to Vera Cruz. The referenced clause from the bill of lading excuses CGM from liability for losses occurring prior to loading or subsequent to discharge from the vessel only, not for losses occurring from and during loading and up to and during discharge.
Resolution of the issue of when the alleged spoilage of the cargo occurred is necessary to determine if CGM might be responsible for such spoilage. The record is currently inadequate to make such a determination and thus such issue cannot be discharged by this summary judgment motion.
As to the issue of whether CGM informed CIC that the cargo would be shipped to Antwerp, there is a dispute of material fact. In his deposition, Bennett stated that he informed Goodfellow that the cargo was to be shipped to Antwerp. Goodfellow states in his affidavit, that he was never informed of such delivery. Summary judgment is thus inappropriate here and the issue survives.
The question of whether CGM refused to allow inspection in Antwerp until after CIC signed the letter of indemnity, as well as the allegation that such letter was signed under duress are issues for the trier of fact.
CGM argues that the Visby Rules[2] apply to the issues raised in CIC’s counterclaim and such rules set forth a one-year limitation on the right to bring suit against the carrier for loss of or damage to goods. CIC argues that the United States is not a party to the Visby Rules. The parties in this case have failed to bring forth evidence sufficient for the court to make a conflict of laws determination as to the applicable law. Thus the court does not consider the application of the Visby Rules at this time.
Summary judgment is denied as to CIC’s first counterclaim.
In its second counterclaim, CIC claims that CGM violated G.L.c. 93A when it allegedly advised CIC that the Mexican authorities would not permit opening the containers and inspection of the cargo at Vera Cruz; CGM represented that the cargo could not be shipped to Houston due to lack of a vessel; CGM shipped the cargo from Vera Cruz to Antwerp without notifying CIC; and CGM refused to allow CIC to inspect cargo in Antwerp until the letter of indemnify was signed.
G.L.c. 93A, §11 provides:
... No action shall be brought . . . under this section unless the actions and transactions constituting the alleged unfair ... or deceptive act or practice occurred primarily and substantially within the commonwealth. For the purposes of this paragraph, the burden of proof shall be upon the person claiming that such transactions and actions did not occur primarily and substantially within the commonwealth.
In determining whether the actions occurred “primarily and substantially” within the commonwealth, the court considers whether the preponderance of wrongful conduct occurred in Massachusetts. See Makino, U.S.A. v. Metlife Capital Credit, 25 Mass.App.Ct. 302, 311 app. rev. denied, 402 Mass. 1101 (1988). Such determination is to be made following a pragmatic, functional analysis of significant factors including consideration of where CIC received and acted upon the deceptive or unfair statements, where CIC sustained injury, and where CGM committed the unfair acts. See Clinton Hosp. Ass’n v. Corson Group, Inc., 907 F.2d 1260, 126566 (1st Cir. 1990).
The deceptive acts of CGM allegedly took place while the cargo was in Mexico, while it was en route to Antwerp, and while it was being held in Antwerp. The fraudulent communications were allegedly made by CGM in Mexico. CGM allegedly refused inspection of the cargo by CIC in Antwerp. The situs of CIC’s loss was either in Mexico, at some location en route to Europe, or in Europe.
CIC did receive the allegedly fraudulent communications in its Massachusetts office, however, as a result, it acted or failed to act outside of Massachusetts, in Mexico or Antwerp. Compare Bushkin Associates, Inc. v. Raytheon Co., 393 Mass. 622, 638 (1985). Furthermore the Bill of Lading governing the delivery of cargo from Rotterdam to Vera Cruz was drafted in Europe.
The preponderance of wrongful conduct alleged by CIC did not occur in Massachusetts and essential elements of the transaction did not take place in Massachusetts. Makino, U.S.A., Inc. v. Metlife Capital Credit Corp., supra at 311. Accordingly the actions and transactions constituting the alleged unfair acts or practices did not occur primarily and substantially within the commonwealth and thus CGM is exempt from G.L.c. 93A, §11. Summary judgment is allowed for CGM on CIC’s second counterclaim.
ORDER
Based on the foregoing, it is ORDERED that Com-pagnie Generale Maritime’s motion for summary judgment is DENIED, as to Central Intelligence Co.’s first counterclaim and ALLOWED, as to the second counterclaim for violation of G.L.c. 93A.

though the Bill of Lading is part of the record, it is extremely difficult to read the referenced clauses because of the poor quality of the document. CIC does not dispute the content of such clauses as set forth by CGM, however, and thus the content of the clauses is considered undisputed.

fyhe International Convention for the Unification of Certain Rules of Law Relating to Bills of Lading signed at Brussels, August 25, 1924.