In re the **MARRIAGE OF** Virginia J. **SIGLIN** and William M. Siglin

Upon the Petition of Virginia J. Siglin, Petitioner–Appellee,

**And Concerning**

William M. Siglin, Respondent–Appellant.

No. 94–1836.

Court of Appeals of Iowa.

Sept. 30, 1996.

Steven H. Shindler of Smith, Schneider, Stiles, Hudson, Serengeli, Mallaney, Shindler & Scalise, P.C., Des Moines, for appellant.

Vicki R. Copeland of Wilcox, Polking, Gerken, Schwarzkopf, Hoyt & Copeland, P.C., Jefferson, for appellee.

Considered by SACKETT, C.J., and CADY, and STREIT, JJ.

CADY, Judge.

William Siglin appeals a decree entered by the district court dissolving his fifty-seven year marriage to Virginia Siglin. He contests the provisions of the decree relating to the division of property, alimony, and attorney fees. We affirm with modification.

Virginia and William Siglin were married in 1937. The district court dissolved the marriage on October 10, 1994, following their separation in 1991. Virginia and William were seventy-five years old at the time of trial. Their two children were adults.

William worked as a farmer throughout the marriage, and engaged in various agriculturally related enterprises. Virginia did not work outside the home. She raised the children and maintained the home.

The parties began their marriage with few assets, but accumulated substantial wealth over the years. They maintained an affluent lifestyle, marked by frequent vacations, expensive cars and several country club memberships. At one time, their net worth was nearly $5 million.

The Siglins owned over 1200 tillable acres of farmland at the time of their divorce. Some of the farms were owned individually and some were owned by their corporation, Siglin, Inc. The land was custom farmed. William was also involved in a livestock operation in Missouri.

The Siglin's financial picture changed in the late 1980's after Virginia and William took over a financially troubled motel business in Des Moines. Their son had invested substantial amounts of money in the construction and development of the motel, and was faced with the prospect of bankruptcy. Virginia and William did not want their son to go through bankruptcy and assumed his obligations. The efforts by the Siglins to save the business eventually proved unsuccessful, however, and William and Virginia were forced to declare bankruptcy.

The Siglins emerged from the bankruptcy with most of their assets, as well as a substantial amount of secured debt. Most of the debt was to a friend, Cecil Reuter, who had also invested in the motel. This debt was evidenced by two notes. The first note was

for $1.2 million and the second was for $354,-019. The Siglins also owed $435,000 to the Internal Revenue Service (I.R.S.) for back taxes, plus penalty and interest.

The first note to Cecil Reuter required annual payments of $137,000, and payments on the second note became due only if the net income from the Siglin farming operation exceeded a certain level. The Siglins were required to pay $100,000 annually to satisfy the I.R.S. debt.

William satisfied his annual obligations to Reuter and the I.R.S. following the bankruptcy, and even made an additional payment to the I.R.S. Following the separation, William provided monthly support to Virginia totaling $1500. Virginia lived in the marital home. Her monthly living expenses were $1760. She also received monthly social security benefits of $456.

At the time of trial, the Siglin's net worth was approximately $1.75 million. Net income from the farming operations varied from year to year, but exceeded $100,000 in 1992. The interest paid on the Reuter and I.R.S. debts was deducted as a business expense in determining net income. William reduced the post-bankruptcy debts by approximately $500,000 prior to trial. He also purchased a house in Arizona in 1993 for $110,000. An expert testified William could save over $40,000 annually if he refinanced his debts at a lower interest rate.

The bulk of the Siglin assets was real estate, including numerous farms. The farm land owned individually was valued around $1 million. The remaining farm land was owned by Siglin, Inc. Other significant assets included stock, a certificate of deposit, cattle, crops, and a note payable. An expert testified the farm land owned individually could be sold with minimal tax consequences, unlike the assets owned by the corporation. All the farm land, however, was subject to a mortgage as a result of the debt to Cecil Reuter.

The trial court awarded Virginia monthly alimony of $1700, and directed William to provide her medical insurance. Virginia was awarded assets valued at $115,000, including the family home and certificate of deposit in the amount of $26,432. William was awarded the remaining assets, and was given responsibility for all the debt. To equalize the property award, the district court ordered William to pay Virginia $725,000 over ten years. William was also ordered to pay attorney fees of $15,000.

William appeals. He first argues the trial court abdicated its responsibility as the fact finder by adopting, nearly verbatim, the proposed findings of fact and conclusions of law submitted by Virginia's counsel. He also argues the property division was inequitable. William believes he will be unable to service his current debt obligations and pay the property settlement and alimony awards. He maintains Virginia should receive her one-half interest in the farm real estate and the cattle operation only after the existing debt has been paid. Under William's proposal, the property would be sold, and the proceeds split, once it was no longer needed to generate income to pay the existing debts. William also asserts the alimony and attorney fee awards were excessive.

## I. Proposed Findings and Conclusions

We have previously approved the practice by trial judges of requesting counsel for both parties in a case to submit proposed findings and conclusions following trial, provided counsel are also permitted an opportunity to comment on the proposal submitted by the other. *See Production Credit Ass'n v. Shirley,* 485 N.W.2d 469, 475 (Iowa 1992); *Kroblin v. RDR Motels, Inc.,* 347 N.W.2d 430, 435 (Iowa 1984). The increasing demands on trial courts to dispose of more and more cases, as well as the technical nature of a particular case, may periodically justify the practice. *See Kroblin,* 347 N.W.2d at 435.

At the same time, we do not encourage the practice of adopting verbatim the proposed findings and conclusions submitted by one of the parties. *See Care Initiatives v. Board Of Review,* 500 N.W.2d 14, 16 (Iowa 1993). A detailed written decision is frequently required by our rules of practice, and it can be one of the most critical aspects of effective decision-making. *See Kroblin,* 347 N.W.2d at 435. A judge written opinion enhances the quality of the decision, assures litigants

their claims were fully and fairly considered, and allows appellate courts to readily ascertain the bases for the decision. *Id.* It is one thing for a judge to think he or she understands a case, and another to put that understanding to the test of writing. Similarly, it is one thing for a party to lose a case, and another to lose with a decision written by the winning party. The latter outcome can undermine the public confidence in our system of justice, and promote further litigation and appeals.

Consequently, the practice of requesting counsel to prepare proposed findings and conclusions must not be employed solely as a means of delegating judicial work or abandoning the decision-making function. To the contrary, it should be done as a cooperative means of assisting the court in preparing a fair and prompt decision. Trial judges can show their responsible use of this practice by refraining from wholesale, or near wholesale, adoption of a proposed decision. Instead, the proposed decision should be a guide, with selected portions incorporated into the independent thoughts of the trial judge.

Although we recognize legitimate concerns exist as to the extent of a judge's actual input into the process when a proposed decree is adopted verbatim, these concerns do not necessarily mean the decision was not a product of independent judicial judgment. *See Makino, U.S.A., Inc. v. Metlife Capital Credit Corp.,* 25 Mass.App. 302, 313–315 518 N.E.2d 519, 526 (1988). Consequently, we do not apply a separate standard of review on appeal from a decree prepared by counsel. *Care Initiatives,* 500 N.W.2d at 16. Moreover, in equity actions such as this we review the evidence anew, disconnected, ultimately, from the trial court findings. *See* Iowa R.App. P. 14(f)(7).

We reject William's claim the case should be reversed because the trial court abdicated its fact-finding responsibility. Moreover, the record can be read to generally support the findings made by the trial court. There were no material findings devoid of evidentiary support. Nevertheless, we resolve the substantive issues presented on appeal from our independent review of the record.

## II. Property Division

■ It is a fundamental principle that parties to a marriage are entitled at the time of a divorce to a just and equitable share of the property accumulated from their joint efforts. *In re Marriage of Wiedemann,* 402 N.W.2d 744, 747 (Iowa 1987). What constitutes a just and equitable award depends on the particular circumstances of each case, after consideration of all the recognized criteria. *In re Marriage of Hanson,* 475 N.W.2d 660, 662 (Iowa App.1991). *See* Iowa Code § 598.21(1) (1995). Although an equitable award is not required to be equal, substantially equal property awards are generally appropriate in marriages of long duration. *See In re Marriage of Geil,* 509 N.W.2d 738, 742 (Iowa 1993). The division of marital debts inheres in the property division. *In re Marriage of Johnson,* 299 N.W.2d 466, 467 (Iowa 1980).

■ William does not challenge the application of the criteria used to divide property, nor claim Virginia is not entitled to a substantially equal amount of the property. The thrust of his claim is the property division was inequitable due to the hardship he will face in paying the cash award. He claims he cannot liquidate any property to pay the award because all the property he was awarded is needed to produce the income to pay the existing debts. He further claims the remaining income is insufficient to pay the cash award and alimony.

The assets of the parties at the time of trial were valued at approximately $3.5 million. The debts exceeded $1.7 million. Although William was obligated to pay all the debt, he was awarded nearly all the assets. Most of the assets produce income, and nearly all of William's income is derived from the assets.

■ We recognize the financial obligations following a dissolution of marriage can be burdensome, especially when the financial obligations during the marriage were not easily satisfied. The ability of a party to meet the financial obligations imposed by a dissolution decree is a relevant factor to consider in determining an equitable division of

property. *See* Iowa Code § 598.21(1)(m) (1995).

In this case, the annual cash settlement and alimony increase William's annual debt obligation nearly $93,000. There was evidence, however, the farming operation could be restructured to help meet this additional obligation. William can reduce his annual debt outlay in excess of $40,000 by refinancing his debts. Additionally, the corporation owned by William has cash available beyond the reported income due to the annual depreciation deduction. This deduction is particularly significant in this case because the corporation owns no machinery or equipment which will need to be replaced in the future. Furthermore, William could liquidate his holdings, or a portion of the assets, and retire all his debts. He claims liquidation would result in substantial tax consequences, but there was evidence the farm land owned individually could be sold with minimal tax consequences. The proceeds from the sale, together with some other available liquid assets, could retire the Reuter and I.R.S. debts and essentially leave the corporation operation intact.

We reject the request by William to delay the property division until the existing debts have been satisfied. This proposal would draw out the dissolution, and promote future problems. *See In re Marriage of Mentel*, 359 N.W.2d 505, 506–07 (Iowa App. 1984). A property award should provide closure when possible, not prolong the dissolution process. *See id.*

The financial obligations imposed on William by the decree may not be easily satisfied. The evidence suggests, however, a solution is feasible. Some practical and economic problems with the implementation of the property provisions of a dissolution decree do not make the division inequitable, and may be an inevitable consequence of structuring a property award in complicated cases. *See In re Marriage of Webb*, 426 N.W.2d 402, 406 (Iowa 1988).

Considering all the circumstances, including the ability to pay the obligations under the decree, we conclude the division of property by the trial court was equitable. We affirm the decision made by the trial court.

## III. Alimony

Many factors are considered in determining the appropriate amount of alimony to be awarded to a spouse. *See In re Marriage of Stark*, 542 N.W.2d 260, 262 (Iowa App. 1995); Iowa Code § 598.21(3) (1995). These factors include the ability of one spouse to pay alimony balanced against the needs of the other spouse, as well as the standard of living the parties maintained during the marriage. *Id.* The division of property is also considered. *See In re Marriage of McFarland*, 239 N.W.2d 175, 179 (Iowa 1976).

We conclude Virginia should receive monthly alimony of $1500. Together with her social security payments, this amount will be more than adequate for her to live at the standard she enjoyed during the marriage. It exceeds her comfortable monthly expenses, including a monthly travel and vacation allowance of $300. We modify the decree to decrease the monthly alimony from $1700 to $1500.

## IV. Attorney Fees

An award of attorney fees in a dissolution proceeding is not a matter of right, but rests within the discretion of the trial court, as well as the needs and abilities of the parties. *In re Marriage of Oler*, 451 N.W.2d 9, 13 (Iowa App.1989). Under the circumstances, we are unable to conclude the trial court's award of attorney fees constituted an abuse of discretion. On the other hand, we deny Virginia's request for appellate attorney fees. She has ample funds to pay her own appellate attorney fees.

## V. Conclusion

We modify the decree of the trial court to set the monthly alimony at $1500. We otherwise affirm the trial court. We deny the request for appellate attorney fees. Costs are divided equally.

**AFFIRMED AS MODIFIED.**

STREIT, J., concurs.

SACKETT, C.J., partially dissents.

VOGEL, J., takes no part.

SACKETT, Chief Judge (concurring in part and dissenting in part).

I concur in part and dissent in part. I concur with the majority's treatment of the issue that the trial court adopted nearly verbatim the proposed findings and conclusion submitted by Virginia. I depart from the majority's conclusion that the record can be read to generally support the findings made by the trial court. I cannot agree that the result reached by either the trial court or the majority is a fair and equitable resolution of the issue of property division.

The trial court and the majority found the net worth of the parties to be about $1,700,000. I find if the parties were required to liquidate their assets and pay the resulting income tax and liabilities their net worth would be closer to $800,000. Their accountant set their net worth in December 1993 at $422,030.22.

The financial obligations imposed on William by the trial court's order cannot be generated either from the sale of or retention of assets. I conclude that to affirm the trial court will not serve either party.

There needs to be some refinancing of the debt to improve the income picture; however, with the substantial obligation the decree imposes on William, I do not see that will be possible for him to do. The income picture needs to improve for William to be able to make the payments ordered under the decree. Additionally, some of the debts (partic-ularly the debt to the Internal Revenue Service) are joint and several obligations and if they are not paid, Virginia's financial picture will be jeopardized.

While I see the bitterness between these two people and the unhappiness with William's alleged girlfriend, I do not see that the assets of this marriage can be saved unless there is cooperation.

I would affirm the award to Virginia of the home and acreage, her automobile, a $26,000 certificate of deposit, and $15,000 for attorney fees. I would strike the provision that William pay Virginia $725,000 plus interest.

I would affirm the award to William of his home at Sun Lakes, Arizona, subject to the debt thereon, and the award to him of his vehicles.

I would appoint a receiver to hold the rest of the assets and either (1) restructure the debt and divide the assets, or (2) sell the assets and divide the proceeds between these two people.

I would award no alimony and order each party pay his or her own attorney fees.