**IN THE COURT OF APPEALS OF IOWA**

No. 13-1879
Filed February 25, 2015

**URBANDALE BEST, LLC,**
        Plaintiff-Appellant,

**vs.**

**R & R REALTY GROUP, LLC, PARAGON
BEST, LLC, and HIGHLAND POINTE
OFFICE PARK OWNERS' ASSOCIATION,**
        Defendants-Appellees.
_____

        Appeal from the Iowa District Court for Polk County, Robert J. Blink,

Judge.


        The non-managing member of an operating agreement to develop

commercial property appeals the district court's ruling in favor of the managing

member.  **AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**


        Michael A. Dee and Haley R. Van Loon of Brown, Winick, Graves, Gross,

Baskerville & Schoenebaum, P.L.C., Des Moines, for appellant.

        George A. LaMarca and Philip D. De Koster of LeMarca & Landry, P.C.,

Des Moines, for appellees.


        Heard by Danilson, C.J., and Doyle and Tabor, JJ.

**TABOR, J.**

This case involves differing interpretations of a 2008 real estate operating agreement between the two fifty-fifty members of Paragon Best, a limited liability corporation developing agricultural land into the Highland Pointe Office Park in Urbandale. Under the Paragon Best operating agreement, R&R Realty Group, LLC is the managing member in charge of the day-to-day business operations, and Urbandale Best, LLC is the non-managing member and investor whose role is limited to approving "major decisions." Urbandale Best is a wholly owned subsidiary of Kansas City Life Insurance Company.

During the development process, R&R executed a series of documents setting up the governance of the Highland Pointe Office Park and giving its officers a majority vote. R&R then conveyed a deed to the new owners' association for a storm water detention pond on Outlot A. Urbandale Best believed those unilateral actions constituted "major decisions" under the operating agreement, which required its approval. To enforce its belief, Urbandale Best sued for breach of contract, seeking declaratory and injunctive relief. R&R filed a counterclaim for breach of contract, alleging Urbandale Best acted in bad faith and obstructed R&R's performance. The district court ruled in favor of R&R; Urbandale Best appeals.

Our de novo review of the record shows Urbandale Best's challenge to the Outlot A deed is without merit. As to the governance documents, when we look at the parties' course of dealings evidenced by their 2006 email/letter agreement, we find both parties intended and acted to implement the prior operating

agreements and the challenged agreement without engaging in a hypertechnical interpretation of the "major decision" matrix. Rather, consistent with the general practices in commercial real estate, the parties expected R&R to unilaterally execute the governance documents and other deeds and easements that are "ministerial" or "ancillary" and "necessary to make the bigger deal go forward" in the ordinary course of business. But because the district court reached beyond the request of R&R, we vacate its sua sponte listing of other actions it found did not constitute major decisions. We agree with the district court that Urbandale Best failed to prove its entitlement to injunctive relief. But unlike the district court, we conclude R&R is not entitled to relief on its counterclaim and vacate the award of damages.

## I.     Background Facts and Proceedings

After carefully scrutinizing the record, we find it supports the following facts. Kansas City Life and R&R entities have a history of working together on real estate developments; since 2005 they have entered into seven joint real estate ventures, with Kansas City Life investing around $50 million in equity in those projects. Generally, the developments start with raw land located in Polk County, and the land is developed into office parks and warehouses, as well as hotel and retail space. The name for each joint venture starts with the word Paragon and is differentiated by the second term, for example, Paragon East, LLC or Paragon Best, LLC. On these ventures, different wholly-owned subsidiaries of Kansas City Life contracted with either R&R Real Estate Investors, LLC ("RREI"—2006 operating agreements) or R&R Realty Group, LLC

("R&R"—2008 operating agreement). The Kansas City Life subsidiary for each joint venture used a name starting with the word Urbandale and the name identifying the joint venture, i.e., Urbandale East, LLC and Urbandale Best, LLC.

The Kansas City Life subsidiaries and the R&R entities perform the same roles in the development projects, i.e., the West Des Moines-based R&R entity is the "managing member" in the ventures' operating agreements and acts as the "boots on the ground" for the real estate developments. The "Urbandale ____" subsidiary, for example, plaintiff Urbandale Best, acts as the "non-managing member" or "equity participant." While the parties share fifty/fifty in the economic interests of the joint ventures, the R&R entities are the sole "managing members."

Des Moines attorney William Bartine served as entity counsel for the Paragon Best joint venture, as well as for the other Paragon joint ventures.

**January 2006 Operating Agreements—Paragon Office Park.** After extensive negotiations over the course of several months in 2005 and early 2006 involving experienced parties and their attorneys, operating agreements for Paragon entities other than Paragon Best were signed at the end of January 2006 between RREI and Kansas City Life subsidiaries for the development of the Paragon Office Park. During negotiations in November 2005, Steve Gaer, executive vice president and general counsel of R&R, e-mailed Tracy Knapp, chief financial officer for Kansas City Life, and attached a draft operating agreement. Included in "Article IV Management of Company" was a major decision matrix with four major decisions, such as refinancing "any indebtedness

affecting one or more of the Projects" and "expansion or new construction of or on one or more of the Projects." These two provisions remained in the final version of the Paragon operating agreements.

Relevant to those two major decisions, Knapp testified that while the parties were negotiating development opportunities, a contract was signed to develop the Citigroup building on a portion of the Paragon East Central land. Knapp believed the Citi building was completed immediately before the January 2006 closings on the joint operating agreements. Wells Fargo provided the construction financing for the Citi building, and MassMutual Life Insurance Company provided the permanent financing.

Knapp responded to Gaer's draft in mid-December 2005 with a redlined version of the operating agreement. Knapp added the language "unanimous approval" to the major-decisions process and included other major decisions. At trial, Knapp explained an expanded major-decision matrix was important to Kansas City Life because "when you're involved in raw ground for future development, there are often differences." Knapp testified:

> It's vital for both members to have protection of their interests so that . . . joint development can occur as both members would like or that it not occur. And it provides incentive for both members to come to an agreement and work together . . . . [W]hile you can't identify all situations where decisions would need to be made, this clearly tries to lay out the preponderance of those things that might occur and have occurred in our experience in joint ventures, the decisions that need to be made.

RREI and Kansas City Life agreed to a matrix containing twenty-three major decisions. Gaer testified R&R entities are not a party to any other joint ventures with an operating agreement including this many major decisions. The

same matrix was included in the currently disputed 2008 Paragon Best operating agreement. Knapp explained there were no additional negotiations concerning the matrix before R&R and Urbandale Best signed the 2008 operating agreement.

The 2006 and the 2008 operating agreements are fully integrated, providing: "This Agreement and the exhibits hereto contain the entire understanding and agreement between the Members and supersede any prior understandings and agreements between them respecting the subject matter hereof."

**Article IV "Management of Company."** Under section 4.1 of the operating agreements, the managing member (RREI or R&R) was to conduct the daily business of the company and to "regularly consult" with the Urbandale ____ entity, the non-managing member, about matters that would arise "outside the ordinary course of business" and "the decisions, if any, which the Managing Member has made or intends to make with respect to any such matters." Section 4.2, performance standards, required the managing member to "use all commercially reasonable efforts to efficiently, prudently, and profitably operate the Company's business and the Projects so as to achieve the profit goals of the Company and a commercially reasonable return on the Members' equity."

Thus, the Paragon joint ventures are limited liability companies that, unlike a partnership, have "designated only one of its members as the managing member." At trial, R&R presented evidence the Paragon joint ventures had generated a profitable return on Kansas City Life's equity, ranging from seven to

sixteen percent.  At no point did Kansas City Life seek to remove RREI or R&R as the managing member.

Section 4.4A, major decisions, stated: "Neither the Company, nor any of the Members acting alone, nor the Managing Member, shall take any of the actions (each a 'Major Decision') set out below without first obtaining the unanimous approval of all of the Members[.]"  Relevant to this dispute, the matrix included as major decisions contracts for longer than one year and conveyances of an interest in land, specifically:

> (13) Any transaction not in the ordinary course of business or affairs of the Company;
> . . . .
> (21) Entering into a contract, agreement or obligation that is for longer than one (1) year, other than leases that do not require unanimous approval of all Members . . . ;
> (22) Granting or conveying any interest in property or any right to use or occupy any property other than leases that do not require unanimous approval of all Members . . . ."

Bartine testified Kansas City Life never proposed including the owners' association articles of incorporation/bylaws or the declaration of covenants, conditions, and restrictions (CC&Rs) in the major decision matrix.  Bartine stated those documents are created in the ordinary course of business of a commercial real estate development and, as such, are used in all of the R&R entities' commercial real estate developments.

In its request for injunctive relief below, Urbandale Best pointed to two actions taken by R&R that allegedly contravened the section 4.4A requirement of major decisions being approved by the non-managing member.  First, Urbandale Best argued R&R's execution of three governing documents, referred to as the

Highland Pointe documents, constituted a major decision reached without approval of the non-managing member. The Highland Pointe documents include (1) articles of incorporation of the Highland Pointe Office Park owners' association (filed with the Iowa Secretary of State), (2) bylaws of the owners' association, and (3) CC&Rs for the Highland Pointe Office Park (recorded with the Polk County Recorder). The documents assigned two seats to Urbandale Best and three seats to R&R on the association's board of directors and architectural review committee. Urbandale Best alleged the structure of the owners' association created obligations that would last for more than one year (major decision 4.4A(21)), which should have been approved by both members under the Paragon Best operating agreement. It also alleged the majority vote for R&R in the owners' association stripped Urbandale Best of its governing authority under the operating agreement.

Second, Urbandale Best argued R&R's execution of a warranty deed transferring ownership of a land parcel known as Outlot A to the Highland Pointe Owners' Association for purposes of a storm water detention pond constituted a major decision under subsection 4.4A(22) because it conveyed an interest in property to a separate entity.

**Course of Dealing.** As the parties were getting ready to proceed in 2006, a sewer easement issue arose. Bartine understood such an easement would require the conveyance of an interest in land. On March 9, 2006, Bartine sent an email to Kansas City Life counsel Karen McConnell and Gaer to determine whether the Urbandale entities wanted to sign such documents as required under

a literal reading of the major decision matrix (major decision 4.4A(22)). Bartine's email began: "[W]e need to discuss the circumstances under which [RREI] can act as the Managing Member of Paragon East Central. That is, when can [RREI] sign documents that bind the Paragon ___, LLCs without a signature by the corresponding Urbandale ___, LLC." Bartine testified his email was intended to be "a go-forward comment and understanding" and "relationship-wide agreement" as shown by the "fill-in-the-blank" language. Thus, although the email first raised the sewer easement, Bartine then listed several other examples of "ministerial" or "ancillary" documents for the parties to discuss, stating:

> [RREI] has always used the rule . . . that it wants its partners to sign significant loan documents, purchase agreements, deeds, settlement agreements, etc. Most of the time [RREI] will talk to their partners before they sign the specific document, or any general class of documents. But in this instance, the City of Urbandale is asking for a sewer easement over Paragon North's land as a condition to filing the plat . . . . In your opinion, should Urbandale North, LLC sign this easement? To my way of thinking, this [easement] fits into a category that I call "ministerial" or "ancillary" documents that are necessary to make the bigger deal go forward, but which don't really affect the major terms of the deal. Another example is a deed to the City for dedication of right-of-way in a platting proceeding. That issue does not present itself in the Paragon Office Park Plat 1 context, but we will face it as the balance of Paragon Office Park is platted. A final example would be routine title affidavits, and perhaps closing settlement statements like the one that the Borrower will be requested to sign in connection with the MassMutual closing.

Bartine explained his email's purpose was to obtain an understanding about the wording in the operating agreements regarding deeds and conveyances and to determine what deeds and conveyances would not require joint signatures under the ordinary-course-of-business concept (major decision 13). He testified the R&R entity in other developments "always had an

understanding . . . that ministerial-type acts would be in the jurisdiction of the managing member." For example, "in platting proceedings, the city requires streets to be dedicated by deed, and that's just [a] part of the process." Bartine testified his email was "meant to cover future projects," including Paragon Best.

The next day, March 10, 2006, William Schalekamp, then senior vice president and general counsel of Kansas City Life, and McConnell came to Des Moines and met with Gaer and Bartine to discuss the email. Gaer testified: "[W]e had a general discussion about how we wanted to make sure we function going forward as far as day-to-day operation of these entities," and "Schalekamp said we agree to these guidelines, and he wrote the sentence on the bottom and signed it."

Schalekamp testified Bartine asked McConnell, "Does everything that needs to be signed have to go to Kansas City for signature?" Schalekamp explained the context of the question was Kansas City Life's relationship with R&R focusing "on those things that the R & R side of the venture would be doing in its capacity as managing member" and "how are we going to operate day-to-day?" He testified that at the time of this meeting, Kansas City Life had been in a similar, profitable real estate development in Arizona for twenty years in which the managing member made "day-to-day ministerial decisions" and ran the "property on a day-to-day basis" while providing Kansas City Life with "decision-making authority on non-day-to-day matters." On Bartine's e-mail, Schalekamp wrote: "These general guidelines are acceptable to the Urbandale LLCs and Kansas City Life." Schalekamp, at the time he signed, understood Bartine's

examples were general guidelines and "not meant to be all-inclusive" because other matters would fall within those general guidelines and be acceptable to Kansas City Life even though not specified in the email.

On appeal, Urbandale Best points out Schalekamp testified he did not have the authority, nor would he have been willing to bind future unknown entities, such as 2008 Urbandale Best, and he believed the parties' March 2006 agreement concerning "ancillary" documents only bound then-existing Paragon entities.[1]  But on cross-examination Schalekamp admitted (1) he signed on behalf of Kansas City Life, (2) at the time he signed, in addition to the already-existing developments, Kansas City Life and R&R were discussing other developments in the greater Des Moines area, (3) he did not tell anyone at the meeting his signature "only relates to existing joint ventures, not to the ones we are contemplating," (4) he did not include any language limiting his agreement to then-existing joint ventures, and (5) he never notified anyone at R&R he "did not want the agreement [he] entered into on behalf of Kansas City Life to apply to Urbandale Best or any of the other on-going joint ventures between the parties."

Bartine testified after Schalekamp signed, "there had been established a basis of understanding as to which conveyances and other documents" the R&R

---

[1] Urbandale Best contends the March 2006 email/letter agreement is not relevant to this dispute because RREI, the party identified by Bartine in the email, is a different legal entity than R&R, the entity joining with Urbandale Best to form Paragon Best.  Noting Schalekamp's testimony on cross-examination and the fact he signed the email on behalf of Kansas City Life and not on behalf of any specific Urbandale ___ subsidiary, we are not persuaded.  We also note Gaer's November 2005 email to Knapp attaching the first draft of the 2006 operating agreements was signed by Gaer as executive vice president/general counsel of R&R, even though RREI entered into those agreements.  Finally, Schalekamp testified he was not consulted with regard to the March 2006 letter agreement before Urbandale Best filed this lawsuit.

entity "alone could execute." Three days later, March 13, 2006, Bartine, as the incorporator, filed the articles of incorporation for the Paragon Office Park owners' association. Article VII, board of directors, provided the owners association's affairs shall be managed by a board of directors and named three directors—Daniel P. Rupprecht, Steven K. Gaer, and Mark Rupprecht. The only signature on the document belonged to Bartine as incorporator, and neither Kansas City Life nor its subsidiaries objected to this filing.[2] This owners' association document governed a large amount of land on six sites from "proprietors" Paragon West, Paragon North, Paragon West Central, Paragon East Central, City I, and Paragon South.

Gaer explained, generally owners' association boards focus on maintaining the development's common areas; "the detention ponds of the development"; snow removal on the private roads; "the collection of assessments that the other third-party owners need to pay as a part of that maintenance; and enforcement of the excusive-use provisions of the park." Gaer explained no "other joint venture entity" has ever asked to be represented on the board of directors of the owners' association or to be represented on the architectural review committee in R&R's numerous other joint ventures.[3]

---

[2] The fact no objection was lodged to this unilateral action undercuts Schalekamp's testimony that at the time he signed Bartine's email, he did not consider articles and bylaws creating an owner's association "would fall within the ministerial duties" that did not require Kansas City Life's approval.
[3] We find credible Gaer's testimony the R&R officials met and performed the functions required of the Paragon Office Park owners' association board of directors and the CC&R-created architectural review committee. We do not find credible Knapp's testimony these joint ventures did not have a functioning board of directors/architectural

Thereafter, according to Bartine, "on a regular basis" RREI—as the sole managing member and pursuant to the 2006 email letter agreement—"unilaterally" prepared and executed "a variety of contracts, agreements, or obligations for longer than one year" but necessary to make the bigger deal move forward (major decision 4.4A(21)). In support of his testimony Bartine prepared Exhibit E, a listing of transactions in which an R&R entity "acted as a sole managing member for a Kansas City Life affiliate project" *without objection* by Kansas City Life or its subsidiary. For example, RREI unilaterally prepared numerous easements in 2007 and 2008. In August 2008 RREI, on behalf of Paragon North, entered into an agreement with the City of Urbandale. In March 2009 RREI filed an owners' consent to plat Paragon Office Park Plat 3.

Bartine explained other unchallenged actions/documents listed in Exhibit E were the same transaction as the now-challenged deed for Outlot A (Paragon Best to the Highland Pointe Owners' Association). Specifically, in February 2010 RREI unilaterally filed the Paragon Office Park Plat 3 storm water management facility maintenance covenant and permanent easement agreement. The next month RREI unilaterally filed a warranty deed from Paragon West to the Paragon Office Park Owners' Association. Kansas City Life did not complain about these unilateral actions nor assert the actions were major decisions under a literal reading of the operating agreement.

Finally, Bartine testified RREI's unilateral actions and filings in Exhibit E were a common course of business in commercial real estate developments. As

review committee and instead items needing to be accomplished occurred by everyone agreeing on everything.

such, similar deeds and conveyances "were prepared, filed, and unilaterally recorded" by R&R entities on developments with its other joint venture partners.

**Paragon Office Park CC&Rs.** Returning to the 2006 timeline, in March 2006 a new mortgage between Citi I, LLC and MassMutual was filed with the Polk County Recorder.[4] One dispute herein is the fact Urbandale Best did not sign the Highland Pointe CC&Rs before they were recorded, unlike in April 2006 where both RREI, Kansas City Life, and the Kansas City Life subsidiaries signed the original Paragon Office Park CC&Rs.[5] The grantors of the Paragon Office Park CC&Rs were six limited liability corporations: Paragon West, Paragon North, Paragon West Central, Paragon East Central, City I, and Paragon South. The Paragon Office Park CC&Rs were recorded on April 24, 2006, about five weeks after the MassMutual mortgage was recorded.

At trial, Knapp testified the April 2006 CC&Rs were not required as part of the March 2006 MassMutual refinancing. Schalekamp testified that when he signed Bartine's email, he did not consider CC&Rs to be "ministerial duties." Bartine testified "other reasons" explained why the Paragon Office Park 2006 CC&Rs and the later March 2010 amended CC&Rs were signed by Kansas City Life entities. Bartine first noted the last paragraph of his March 2006 email, "a borrower will be requested to sign in connections with the MassMutual closing." Bartine then explained:

---

[4] Under the mortgage, notices to the borrower needed to be sent to City I, LLC, c/o R&R, Attention: Gaer with copies to Knapp at Kansas City Life and Bartine.
[5] Daniel Rupprecht signed the CC&Rs on behalf of the five Paragon LLCs and RREI. He also signed for City I, LLC. William Schalekamp signed on behalf of the Urbandale LLCs and Kansas City Life.

My recollection and my records would indicate that at that time we had a major expansion going on at the Citi building, and it involved amendments to . . . the substantial loan obligations.  And in any deal that I've done with R&R since 1993 . . . when there is financing involved, everybody's going to sign . . . .  So if you're going to present a stack of mortgage documents to Kansas City Life to sign, another document that is going on at that time is the [CC&R's], why not get them to sign it?  It is good practice.

[Second,] at the time of the first amendment to those [CC&Rs in 2010,] we did those in conjunction with the Dahl's exchange.  And again, when you are talking about a transaction of that scope, why not put another document in front of the partner to have them sign.  I don't think it was ever a concession that these [CC&Rs] were anything other than day-to-day real estate development documents.  But that is . . . the reason that they were signed by Kansas City Life, because it was, frankly, convenient to do it.

**Paragon Office Park.**  In March 2008 Gaer went to Kansas City to meet with Schalekamp.  Gaer told Schalekamp "our relationship between R&R and Kansas City Life has become almost adversarial on these developments."  Gaer gave two examples.  First, by objecting to leases to smaller tenants, Kansas City Life "has basically eliminated 58% of our tenant base."  Second, Kansas City Life "did not like governmental entities as tenants.  And they're fantastic tenants."  Gaer stressed to Schalekamp "we've got to get by these issues, because we can't run our business, and what you're suggesting we do is economically disadvantageous to both of us."

**Operating Agreement for Paragon Best.**  On August 27, 2008, Urbandale Best and R&R entered into the Paragon Best operating agreement at issue.  Under the agreement, both members hold an equal ownership interest, each making a capital contribution of $2,973,195.81.  This venture is much smaller than the 2006 Paragon Office Park joint ventures and involves

approximately thirty to forty acres of agricultural property slated for long-term development into the Highland Pointe Office Park. The 2008 operating agreement was "amended and restated" from the 2006 operating agreements originally negotiated by the related,[6] but differently titled entities in 2006.

As in the earlier Paragon Office Park developments, R&R undertook unilateral actions on the behalf of Paragon Best to advance the development of Highland Pointe Office Park. As specifically detailed in Exhibit E, in April 2011 R&R signed a development agreement between Paragon Best and the City of Urbandale (filed November 2011). On July 12, 2011, R&R unilaterally executed numerous documents: owner's consent to plat Highland Pointe Office Park Plat 1, the easement for sanitary sewer right-of-way, three easements for storm sewer and surface water flow, and an easement for access (all filed March 2011). On September 28, 2011, R&R executed an easement for ingress/egress (filed March 2011). None of these unilateral actions drew an objection from Urbandale Best or Kansas City Life on the grounds that these actions were "literally" major decisions under sections 4.4A (21), (22) of the operating agreement.

The unchallenged, unilateral actions of R&R emerged from the following chronology of events. The business relationship between Kansas City Life and R&R—dating back to 2005—had grown adversarial. The parties clashed over the design of the Dice Building in the Paragon South development. The current litigation, commenced in spring 2012, is the third lawsuit "with a Kansas City Life-

---

[6] The 2008 operating agreement defined "Related Company" as "[a]ny of the following limited liability companies, so long as the Members or their Affiliates each hold a 50% interest in such limited liability company: Paragon West, LLC; Paragon West Central, LLC; Paragon East Central, LLC; Paragon South, LLC; Paragon East, LLC."

related entity and R&R." Previously, the parties had been litigating how much R&R would pay to buy out Kansas City Life subsidiary Urbandale East Central in the Paragon East Central joint venture.[7]

**Rezoning and Highland Pointe Documents.** Returning to facts specifically related to Paragon Best, Gaer explained the parties had rezoned fifteen acres of the overall land to retail. After the rezoning, Kansas City Life and R&R "knew that we were going to sell those parcels off, because we really aren't retail developers." Knowing sales would be forthcoming, Gaer asked Bartine to draft the Highland Pointe documents and suggested Bartine base them on the 235-acre "Paragon Office Park documents since those have been in existence since 2006." On March 19, 2012, Gaer asked Bartine for an update, noting the documents needed to be "finalized and recorded as soon as possible since our team is now out marketing the retail land for sale. I want to make sure all of these documents are in the public record so any potential purchaser is on actual notice."

---

[7] Gaer described the disagreement leading to a buyout. R&R had a parcel of land it wanted to develop into a warehouse. R&R shared market and financial budget information with Kansas City Life for building a 140,000 square foot warehouse. With Kansas City Life's consent, R&R hired engineers to lay the warehouse out on the site. "And out of the blue," Knapp and Greg Galvin, Kansas City Life vice president for real estate, "show up one morning and hand me a development proposal where Kansas City Life was going to build two 60,000 square foot warehouses on that parcel." Further, Kansas City Life planned to "use a construction company that was not an R&R construction company. They were going to use a leasing company that was not an R&R leasing company. And they were going to use a property management company that was not an R&R leasing company." Knapp and Galvin asked me "if R&R would like to be a 50% owner in that." Gaer responded, "what would . . . motivate you to think that [R&R wants] to own 50% of two buildings that we don't build, manage, or lease in the middle of our 2 million square feet of construction of our buildings."

Bartine drafted the documents and sent a copy to Kansas City Life vice president Galvin and counsel Matthew O'Connor in a May 25, 2012 email, stating: "I am attaching the 'association documents' for Highland Pointe Office Park (articles of incorporation; bylaws; declaration of covenants; deed conveying storm water detention area to the association)." Bartine noted "significant changes" from the Paragon Office Park documents, including: "The documents tighten up the approval process for development, and give the Architectural Review Committee broader authority by adopting a 'sole and unfettered discretion' standard for most decision-making." Bartine believed the "unfettered discretion" standard was consistent with section 4.4 of the operating agreement.

In early June Knapp responded to Mark Rupprecht, stating Urbandale Best's disapproval and belief the "documents include authorities that are Major Decisions in the [operating agreement] and the proposed draft documents would circumvent KCL's authorities as 50% owner." Knapp objected to the "deeding any land, such as proposed Outlot A, to any other parties unless R&R and KCL have agreed to this Major Decision."

A few days later, the parties participated in a conference call and discussed Knapp's concerns. Knapp testified Gaer understood his concerns but "also expressed that he wanted to make sure that the roles of the members in the operating agreement were not changed." Knapp responded the first draft was "completely at odds with the consistency of the operating agreement with regard to each member's rights."

On August 28, 2012, Knapp and O'Connor held a conference call with Bartine. Knapp recalled again stating Urbandale Best's desire for equal representation on the board of the owners' association and the architectural committee should those documents go forward.

The next day Knapp sent an email to Mark Rupprecht and Gaer and included an attachment of "redline changes" to the Highland Pointe documents.[8] Knapp stated: "Most of the redline edits are reflective of changes to provide for equal participation by R&R and KCL, consistent with the phone conversation that we had back in June on this topic."[9] Gaer testified Urbandale Best's desire for equal representation on the board of directors and architectural committee was "an unusual request." Also:

> Q. Despite it being an unusual request, did you give it serious consideration? A. We did . . . . [W]e've always wanted input from KC Life, but when it came time to make the ordinary decisions that we needed to make as the managing member, if we didn't agree with what their suggestion and advice was, we made the decision as the managing member that we thought was in the best interest of the real estate investment business pursuant to our standard in 4.2 of the operating agreement.

---

[8] Also on August 29, 2012, O'Connor sent a follow up e-mail to Bartine attaching the redlined versions of the Highland Pointe documents. We note the redlined versions did not change the signature block that contained only Gaer's signature on behalf of R&R for Paragon Best, i.e., signatures from Kansas City Life or Urbandale Best were not required in Urbandale Best's redlined versions.

[9] The redlined document stated the "Architectural Review Committee" (ARC) shall be composed of four individuals, two selected in the sole discretion of Kansas City Life and the other two selected in the sole discretion of R&R. "Unless these CCR are amended, each member of the ACR must be an officer or employee of KCL or R&R respectively." The document listed the initial members of the committee as Daniel P. Rupprecht and Mark A. Rupprecht (R&R) and Tracy W. Knapp and Gregory M. Galvin (KCL). "No action of the ARC is considered approved unless approved by unanimous consent of the ARC." The redlined document also added language stating: "No action of the [owners' association] Board is considered approved unless approved by the unanimous consent of the Board."

R&R met internally and discussed the redline changes the day after receiving Knapp's email. A copy of the redline changes—bearing notes handwritten by Gaer on August 30, 2012—was turned over to Urbandale Best during this litigation. Gaer's notes captured the views of R&R officers on the Urbandale Best proposals. There were several "OK" notations, including: "The sole Member of the Association is Paragon Best, LLC." In several cases the notes suggested contacting Bartine for his opinion. As to Urbandale Best's total deletion of the section regarding "Powers Regarding Retail Site," the notes stated: "Need this so people buying retail sites are 'on notice.'" Also, some of the "no" notations were followed by, "we are setting out specific provisions of § 504.901" or "follow the language of the statute."

The notes included the following comment, "KCL can't 'control' [with an arrow to the word 'unanimous'] the decisions (we are the managing member), incorporate what we agree with, delete balance of changes and record (wait to 'resolve' this once we have closed on Paragon East Central, LLC")[10]—attributed to R&R founder Dan Rupprecht. A second note, again referencing the word "unanimous" and in the section discussing the developer's [Paragon Best's] reserved rights and powers "to sell" building sites, stated: "See operating agreement, section 4.4A(22). Keep consistent with that."

Next to Knapp's proposal for equal representation on the board of the owners' association, the notes stated: "No" and "operating agreement § 4.4A

[10] Knapp explained R&R's plan to "wait to 'resolve' this" referenced the ongoing litigation and settlement talks concerning the value of R&R's buyout of the Paragon East Central Project, which closed on December 26, 2012—four months after the internal R&R meeting.

Major Decisions, not a major decision." Similarly, next to "Board of Directors, Selection, Term of Office," the notes stated: "No, 'outside' the operating agreement. R&R needs to have 'control' other than for Major Decisions per § 4.4A of operating agreement." On the page defining the architectural review committee, Gaer jotted the following note: "KCL must be minority of bd."

At trial, Knapp admitted the handwritten notes do not show any intent on the part of R&R to circumvent the operating agreement. Gaer testified Kansas City Life had never asked for representation on the board of directors of the owners' association or the architectural committee in the earlier development of Paragon Office Park. Bartine testified R&R entities filled the board and architectural committee roles in all of R&R's developments and historically, the non-managing members did not play a role in either the board or committee.

**October 2012 Quarterly Meeting and Closing of Sale of Paragon East.** Representatives from Urbandale Best and R&R met in Des Moines for a regular quarterly meeting on October 3, 2012. The agenda listed eight items, including the marketing efforts for Highland Pointe, Paragon East Central purchase and sale agreement, and covenants for Highland Pointe. Galvin recalled a "very brief discussion" by Gaer of the need for the articles, by-laws and declarations to follow the Iowa not-for-profit association statutes. Anticipating a broader discussion of the documents, Galvin brought copies to the meeting but never took them out of his briefcase. Galvin left the meeting believing his company's comments were still under review.

Knapp recalled Gaer explaining his concern that Urbandale Best's proposed changes would alter the roles of the members in the operating agreement and Knapp's response their version "had nothing to do with altering the impact or roles of the members under the operating agreement." But Gaer, according to Knapp, did not share the level of disagreement reflected in the R&R meeting notes. Knapp also recalled Gaer stating his concerns about the Iowa not-for-profit statute and his plan to ask Bartine for further analysis of the interplay between the proposed changes and the statute.

In contrast, Gaer recalled stating:

[First], some of the changes [you are seeking] change the statutory language of the Iowa not-for-profit law. And they said, well, [O'Connor] shouldn't have done that . . . . [W]e understand that we can't change what the Iowa law says.
[Second], as we read some of these changes, you . . . are trying to change the roles of KC Life and R&R vis-à-vis the operating agreement. And [Knapp] said, well, we shouldn't be doing that. So at that time I suggested [getting Bartine] on the phone, he was the agreed-upon entity attorney, and let's go through these so we can finalize them.

On October 12, 2012, Gaer sent an email to O'Connor to follow up on the "discussion we had last Wednesday with [Knapp and Galvin] when they were in town." He wrote, "please let me know a couple of dates and times that you guys are available for a conference call with us and Bill Bartine so we can finalize" the Paragon Best "owners' association documents and CC&Rs." Starting in October 2012, the monthly reports from R&R to Kansas City Life noted R&R was waiting for dates/times from Kansas City Life for a joint conference call with Bartine to finalize the Highland Pointe documents. Gaer testified: "At no time did they ever get back to us and take us up on our request to have a conversation to finalize"

the Highland Pointe documents. Knapp admitted Urbandale Best did not respond to Gaer's request to provide its conference call availability to finalize the Highland Pointe documents.

On December 26, 2012, R&R's buyout of Urbandale East Central's interest in the Paragon East Central development closed.

**January 2013 Quarterly Meeting.** On January 10, 2013, Kansas City Life officers Galvin and Knapp again met with Gaer in Urbandale. Gaer testified the parties discussed the sale of the Paragon Best retail land—the locations to sell, the size of the parcels to sell, and the selling price. Knapp testified similarly. Knapp and Gaer both testified that Gaer reminded Urbandale Best "we need to get the CC&Rs and the owners' associations finalized, because we're very close to signing purchase agreements on two transactions to sell land in Paragon Best" to parties in competition to build a hotel.

**Bartine's Preparation of the Highland Pointe Documents.** Gaer and Bartine both testified R&R did not seek to circumvent the Paragon Best operating agreement. Specifically, Gaer testified to his instructions to Bartine regarding drafting the Highland Pointe documents:

> I'm asking you as the entity counsel to go through all the changes requested by Kansas City Life, and what I'm asking you to do is make whatever changes you think are in the best interest of Paragon Best, LLC, as the entity counsel, with the exception that we fundamentally have an agreement with KC Life that any changes that change the Iowa not-for-profit laws won't be made, and any changes that change the roles of the parties, vis-à-vis the operating agreement, will not be changed.
> With those exceptions, I need you to finalize these, and I need you to record them so I can get them to the buyers.

Bartine testified:

Q. . . . When you were making changes and resolving the discussions and input you had from the two owners of Paragon Best to what eventually became [the Highland Pointe documents,] your number one goal was to follow the operating agreement and not to take specific suggestions from either party; is that correct? A. That is not only correct, but that is the specific discussion I had with Mr. Gaer. He said, "You make the changes in compliance with the operating agreement."

Bartine also testified he came to the conclusion in early January 2013 that Urbandale Best did not have the right to consent to the three Highland Pointe documents because the documents were not major decisions. On January 25, 2013, R&R signed the first Paragon Best purchase agreement with a hotel developer. Bartine recalled "Gaer specifically came to my office saying we need to get this stuff done and get it out of here, and you need to get Kansas City Life notified of this."

On January 28, 2013, R&R unilaterally issued a warranty deed on behalf of Paragon Best that conveyed Outlot A to the Highland Pointe owners' association (recorded in February 2013). That same day, R&R signed the second Paragon Best purchase agreement with another developer. The purchase agreements specifically stated the buyer acknowledges their purchase is subject to the Highland Pointe Office Park Association and CC&Rs, referenced as an exhibit. Gaer explained the signed agreements "had nothing attached" because the documents had not yet been finalized.

On January 29, 2013, Bartine filed the final Highland Pointe homeowner's association articles and bylaws. On January 30, 2013, Bartine recorded the Highland Pointe CC&Rs. Bartine testified the timing was a "practice glitch" and "I

wish I had gotten them out sooner . . . . But . . . I got them out as quickly as I could."

**Bartine Letter—Highland Pointe Documents.** On February 14, 2013, Bartine first informed Urbandale Best the Highland Pointe documents had been finalized, filed, and recorded. Bartine testified he had other big financing projects going on at the time and

> if I was a procrastinator . . . so be it . . . . I don't want this to be about a matter of disrespect for Kansas City Life; that is not what this is at all. This is a matter of I made the judgment that this was a document that is in the ordinary course of real estate development, and I didn't think I needed to consult with anybody other than . . . the managing member on it.
>     . . . .
>     Q. Did R&R tell you not to inform Urbandale Best about your opinion on these documents or the form that they were going to be filed until after they filed them? A. Quite the contrary. I was getting frequent calls, emails from Mr. Gaer saying this needs to get out. This needs to get out to Kansas City Life. So . . . on the timely issue of this, if there is anybody who has to have broad shoulders, it's me.

In the February 2013 letter to O'Connor, Bartine specifically stated the "Developer's power to sell lots is subject to section 4.4A" of the operating agreement. Bartine detailed his efforts "to reconcile" the Highland Pointe documents with the 2008 Paragon Best operating agreement, with his "primary directive" being to "have the provisions of the association documents line up with the general management duties of the Managing Partner" in the 2008 operating agreement.

> As I read section 4.4A . . . the Members have stated that the Managing Member should have the authority to make all non-major decisions because it has expertise in the local commercial real estate market. In other words, if the matter does not fall in a Major Decision Category, let the Managing Member manage. However, it

is also essential that the KC Life entity should have a voice at the table by assigning board seats to KC Life, allowing KC Life input on decisions.

So to make the office park regulatory documents consistent with the [2008 operating agreement,] we need to look at section 4.4A, . . . which provides that neither Member acting alone, nor the Managing Member, may make specifically enumerated "Major Decisions" (sometimes "MD") without the unanimous written approval of all of the Members.

Next, Bartine analyzed section 4.4A to determine "if the proposed actions in connection with the current hotel transactions and the finalization and filing of the business park regulatory documents" (the Highland Pointe documents), "might be characterized as 'Major Decisions' requiring all members to consent, or 'Not-Major Decisions' that the Managing Member can initiate, structure, and close/finalize." He then discussed the "authority" of the managing member to enter into the Highland Pointe documents and concluded nothing in the major decision matrix in section 4.4A limits the ability of the Managing Member to execute and file organizational documents and to promulgate bylaws, "provided the documents are crafted to give the Managing Member the flexibility to make decisions. In the case of the subject documents, they provide the non-managing member with a seat on the various boards and an ability to be present as the matters are discussed."[11]

---

[11] Bartine described the changes to the final "Articles of Incorporation of Highland Pointe Office Park Owners' Association" as including five board members/directors, three from R&R and two "as the KC Life members"—the "theory here is to give KC Life access to the information and discussions that lead up to decisions, but to have the majority of votes vested in the Managing Member's representatives"—(amendments require a majority vote). He also described the bylaws as the board directors being "appointed by R&R and KC Life (and their respective affiliates)." Finally, Bartine described the CC&Rs as including a five-member architectural review committee "with three selected by the R&R parties and two by KC Life and its affiliate," with decisions by a majority.

Bartine likewise concluded 4.4A(21) and (22) did not limit R&R's actions as to the CC&Rs, noting: "[W]hat is more clearly fitted into the Managing Member's market expertise than the form of restrictions that will allow fair management and maintenance of the office park without over-restricting and devaluing the property and its uses." Bartine stated he was "also comforted by the fact that the proposed association documents AND the CC&Rs are based on the Paragon Office Park model documents, so there is a course of dealing in that area."

Finally, Bartine stated: "I have spent quite a bit of time considering section 4.4A of the [operating agreement,] and I believe that these changes to the association documents are materially consistent with the powers allocated to the Managing Member and those retained by both Members to act on 'Major Decisions.'"

**O'Connor and Gaer Letters.** On March 15, 2013, O'Connor reacted to Bartine's letter by sending a letter to R&R's Daniel Rupprecht stating the finalized documents were filed "without the consent of KCL" and "wholly ignore" its comments as "sent to William Bartine via email on August 29, 2012, and which were discussed by the parties at length in a subsequent conference call, in an October 3, 2012 meeting, and in a January 10, 2013 meeting." O'Connor also wrote, this "correspondence constitutes KCL's notice that, by having filed these three documents, R&R, acting as the Managing Member, may be in material breach" of the operating agreement.[12]

---

[12] The Paragon Best operating agreement's "major decision" section provides:

On March 20, 2013, Gaer responded to O'Connor's letter because Rupprecht was out of the office. Gaer understood O'Connor was objecting to the Highland Pointe documents. Gaer stated he believed Bartine's February letter addressed the concerns O'Connor raised and R&R believed the recording of the Highland Pointe documents was in compliance with the operating agreement. "We were concerned that any further delay in recording those documents would have been detrimental to the owners of Paragon Best, LLC due to the pending sales of two (2) retail sites and could have placed R&R in violation of Section 4.02 of the operating agreement."

Gaer noted the owners' association/CC&Rs were based on the 2006 documents. Also, R&R had received "KCL's suggested changes" to the documents three months after Bartine sent out a draft "for review and comment." Gaer then noted the documents were an agenda topic at the October 3 meeting and during the conversation Knapp and Galvin "agreed that KCL's changes should not vary the Iowa statutory provisions applicable to not-for-profit entities nor should the changes alter the parties' respective responsibilities and duties" in the operating agreement. Gaer reminded O'Connor of Gaer's follow-up email "asking for KCL to provide me with a couple of dates and times for a conference

---

A Member shall be deemed to have Approved any such Major Decision in the event that such Member does not Approve or disapprove such Major Decision in writing to the Managing Member within thirty (30) days . . . after notice of a pending Major Decision is sent to such Member by the Managing Member.

The district court ruled that Urbandale Best did not provide timely notice to R&R under this provision because O'Connor's letter mentioned only Kansas City Life. We disagree with the district court on the notice issue, but ultimately hold R&R did not breach the operating agreement.

call with Bill Bartine to finalize" the Highland Pointe documents. "At no time did KCL provide us with any dates or times for a conference call to further discuss" with Bartine the Highland Pointe documents.

Gaer stated at the January 10 meeting, Knapp and Galvin "acknowledged" that "we needed to finalize and record the Owners' Association/CC&Rs before closing on either of those sale transactions to ensure that those parcels and their subsequent owners would be subject to the Owners' Association/CC&Rs." Gaer concluded: "Because of the pending sales and no timely response back from KC Life, we asked [Bartine] to finalize the drafts based on the discussion and philosophical agreement reached between R&R and KC Life at our October 3, 2012 meeting."

**District Court Proceedings.** On April 1, 2013, Urbandale Best filed suit alleging R&R breached the operating agreement, asking for a declaration vacating the Highland Pointe documents, and seeking temporary and permanent injunctions barring R&R from taking action allegedly authorized by those documents that otherwise required the unanimous consent of the parties. R&R filed an answer and counterclaim, alleging Urbandale Best breached the contract by preventing R&R from managing Paragon Best.

The district court held a temporary injunction hearing on June 13, 2013. O'Connor, Bartine, and Gaer testified. At issue was whether Paragon Best and R&R should be stayed from proceeding pursuant to the Highland Pointe documents until the court had made a final determination on whether the

Highland Pointe documents are major decisions.[13] Using the Dice Building as an

example, O'Connor testified to the "irreparable harm" causing it to seek an

injunction:

> Under the previous operating agreements, if one party wants to propose a build opportunity and the other party does not agree with that build opportunity, the proposing party has the opportunity to purchase the other member's interest. That occurred regarding a proposed build opportunity for [the] Dice Building.
> Urbandale interest disagreed with that. So we agreed to the buyout . . . . [A Planned Urban Development was in place.] The PUD required that any construction on Paragon South to be of generally brick material, earth-tone, neutral colors, landscaping to provide for a homogenous development.
> . . . .
> And so once we agreed to let them buy us out on the proposed Dice building, they had control of the PUD. They then changed the standards for brick buildings and things like that and directed a single-story white building that has black glass throughout the middle of it . . . . It is not consistent [with] the master plan for the original Paragon properties.
> And the concern for irreparable harm is that if Urbandale is not represented equally on the boards . . . that the same situation could occur again, where we pass on a building opportunity and then smack-dab potentially in the middle of the rest of the land we are going to be stuck with a building such as the Dice building, *which could cause irreparable harm in the sense of development opportunities that others pass on because of the existence of this building.*

(Emphasis added.) The district court questioned O'Connor to clarify Urbandale

Best's position:

> THE COURT: Did [Kansas City Life] participate in any of the actions before the city with regard to a change in the design or appearance of the [Dice building].
> O'CONNOR: No.

---

[13] Bartine acknowledged if the court later determined the Highland Pointe documents do constitute "major decisions," the documents could be refiled or amended with the consent of both parties.

THE COURT: So you're complaining about it now, but you did not involve yourself in the actions before the city that might have precluded a different appearance?

O'CONNOR: That is correct. And the reason being, by that time we were in the process of liquidating our assets in . . . the Paragon developments except for the unimproved land for Paragon West and North.

. . . .

THE COURT: You had a remedy to try and prevent the construction of a building that you thought was inconsistent with the plans then existing for the whole development?

O'CONNOR: Correct.

THE COURT: You just did not?

O'CONNOR: Yes.

THE COURT: Would the same opportunity be available to you in the [Paragon Best] agreement if you did not believe that a building constructed pursuant to a buyout was consistent with the overall plans of the development?

. . . .

O'CONNOR: That is an option that we could pursue.

The district court balanced the equities and concluded "Urbandale Best has not met its burden to justify issuance of a temporary injunction." The court concluded an "injunction at this time would harm both parties by delaying the closing of the first sale of land at Paragon Best."

In August 2013, the district court held a three-day bench trial. The parties stipulated the temporary-injunction proceedings were a part of the trial record. Gaer testified that at the time R&R signed the Paragon Best operating agreement, it did so with the understanding that the matters agreed upon in the 2006 Bartine email/letter agreement were a part of the intent of the parties upon signing. Further:

Q. And at the time R&R signed [the Paragon Best operating agreement], did it do so with the understanding that there had been since [the Bartine email/letter agreement] actual examples in conformance with [it]. A. Yes.

> Q. . . . [W]as that course of conduct such that it formed part of the intent of R&R at the time it signed [the Paragon Best operating agreement]? A. Yes.
>
> Q. Without the understanding in [the Bartine email/letter agreement], would R&R have signed the Paragon Best, LLC, operating agreement . . . ? A. If Kansas City Life wanted as much control and authority as they claim to want today, we would have never brought them in as a partner.
>
> Q. Why not? A. Because we can't operate our business. This is our hometown. We've got six-million square feet of commercial real estate, and we need to be able to operate our business here and to protect the reputation and the integrity of R&R.
>
> Q. Can you envision anything that R&R would do as the sole managing member of Paragon Best that would not be also in the same interest, good or bad, for Urbandale Best? A. No, because we're 50/50 partners in that land, and R&R has another two-million square feet in Urbandale. So the last thing [R&R is] going to do is create problems for ourselves in developments in [Urbandale, where we are the biggest taxpayer].

Further, Gaer testified the Highland Pointe documents "fall under the rubric of what the managing member's responsibilities were going to be" and are not major decisions based on the "custom and usage of the real estate development market" and the parties "past course of conduct."

In October 2013 the district court ruled Urbandale Best failed to meet its burden to secure a permanent injunction or declaratory relief because R&R did not breach the operating agreement. The court based its ruling on "the custom and practice in the industry, the course of dealing between the parties, and the express purpose of the parties' letter agreement [from 2006]." Although R&R did not request the district court do so, the court also listed eight matters that did not constitute major decisions under the operating agreement. On R&R's counterclaim, the court ruled Urbandale Best breached the operating agreement "by making R&R's performance impossible" and determined $23,122.50 was "an

appropriate measure of damages" considering the time expended on the litigation by R&R personnel.

Urbandale Best now appeals.

## II. Standards of Review

Urbandale Best's request for declaratory judgment and injunctive relief invoked the district court's equitable jurisdiction. *See* Iowa R. Civ. P. 1.1501. We review the district court's ordering denying Urbandale Best's request for relief de novo. *See City of Okoboji v. Parks*, 830 N.W.2d 300, 304 (Iowa 2013). The district court's findings of fact are not binding, but we give weight to its assessment of witness credibility. *Id.*

Because R&R's counterclaim for breach of contract was tried in the same equity proceeding, we also review it de novo. *Rector v. Alcorn*, 241 N.W.2d 196, 199 (Iowa 1976) ("[O]nce equity has obtained jurisdiction of a controversy, it will determine all questions material or necessary to accomplish full and complete justice between the parties, even though in doing so it may be required to pass upon some matters ordinarily cognizable at law.").

Urbandale Best urges us to apply an additional layer of scrutiny to the district court's decision. It asserts the court's ruling so closely tracks the proposed findings and conclusions submitted by R&R that the independence of the court's reasoning deserves a closer look on appeal. *See In re Marriage of Siglin*, 555 N.W.2d 846, 849 (Iowa Ct. App. 1996) ("[T]he proposed decision should be a guide, with selected portions incorporated into the independent thoughts of the trial judge."). R&R responds that "[t]he fact that the district court

requested both parties to submit proposed findings does not negate the fact that the district court heard all of the evidence and was the judge of the credibility of the witnesses."

Our supreme court has recognized "counsels' submission of proposed findings of fact and conclusions of law can be extremely valuable in assisting the district court, especially in highly technical or complicated cases." *See NevadaCare, Inc. v. Dep't of Human Servs.*, 783 N.W.2d 459, 465 (Iowa 2010). But the supreme court has discouraged district courts from adopting verbatim the proposed findings and conclusions prepared by counsel for one of the parties, lest it appear the court has abdicated its responsibility to reach an objective determination. *Id.* at 465–66; *see Rubes v. Mega Life & Health Ins. Co.*, 642 N.W.2d 263, 266 (Iowa 2002) ("[T]he customary deference accorded trial courts cannot fairly be applied when the decision on review reflects the findings of the prevailing litigant rather than the court's own scrutiny of the evidence and articulation of controlling legal principles.").

In this case, the district court ruling does borrow liberally from R&R's proposed findings of fact and, to a somewhat lesser extent, from its conclusions of law. But that drafting issue alone does not signal the district court's abdication of its independent decision making. The transcripts of the injunction hearing and the bench trial show the court was keenly interested in the factual background and legal issues and engaged in its own questioning of witnesses for both parties in an effort to clarify the record. While Urbandale Best has raised legitimate concerns, we believe the district court decision was the product of independent

judgment. *See Siglin*, 555 N.W.2d at 849. Finally, "in equity actions such as this we review the evidence anew, disconnected, ultimately, from the trial court findings." *Id.*

## III. Principles of Contract Interpretation and Construction

In contract cases, our supreme court has described interpretation as determining the meaning of words in a contract and construction as deciding the legal effect of such words. *Fausel v. JRJ Enterprises, Inc.*, 603 N.W.2d 612, 618 (Iowa 1999). The "cardinal rule" of contract interpretation is to decipher the intent of the parties at the time they entered into the agreement. *See Pillsbury Co. v. Wells Dairy, Inc.*, 752 N.W.2d 430, 436 (Iowa 2008). If we can ascertain the principal purpose of the parties, we give it great weight. *Id.* We can consider extrinsic evidence to help us in the process of interpretation. *Id.* Because "meaning can almost never be plain except in a context," we determine the meaning of contract provisions in the light of all relevant evidence, including the situation and relations of the parties, their prior course of dealing, and usages of the trade. *Fausel*, 603 N.W.2d at 618 (stating the rule that words "are interpreted in the light of all the circumstances is not limited to cases" where ambiguity exists). We use these rules to determine "what meanings are reasonably possible" and also to deduce our choice "among possible meanings." *Pillsbury*, 752 N.W.2d at 436. "'But after the transaction has been shown in all its length and breadth, the words of an integrated agreement remain the most important evidence of intention.'" *Fausel*, 603 N.W.2d at 618 (quoting Restatement (Second) of Contracts § 212, cmt. b, at 126 (1981)).

**IV.    Application of Principles to Paragon Best Operating Agreement**

R&R and Urbandale Best present competing views of the Paragon Best operating agreement and under what circumstances it would require R&R, as the managing member, to obtain the agreement of Urbandale Best, the non-managing member, under "Article IV Management of Company."  Urbandale Best contends R&R unilaterally entered into three contracts (owners' association/CC&Rs/Outlot A deed) that stripped Urbandale Best of its management rights under the operating agreement's major decision matrix.  R&R responds the March 2006 Bartine email/letter agreement reflected the intent of the parties about how the relationship would proceed and now, mid-game, Urbandale Best "seeks to change the rules or suggest they never applied."

**A.    Deed.**  Our de novo review of the record shows Urbandale Best's challenge to the Outlot A deed is without merit.  We give no credence to Knapp's testimony that at the time of the deed's execution Kansas City Life might have preferred another location for the detention pond.  As explained below, we agree with the district court's statement the "suggestion that Urbandale Best would not have signed the deed to the detention pond because it would have selected other means for storm water detention is patently incredible."

Two years before the deed was recorded, in 2010, R&R sent Urbandale Best the master grading plan that showed the dimensions and location of the storm water facility.  The accompanying email told Knapp and Galvin: "We need to start the project now in order to get the grading completed."  The email also stated the City had agreed to pay for the grading of a street to be completed the

next year and the City was considering R&R's request for rezoning to retail. Thereafter, the City agreed to R&R's retail proposal, and R&R and Urbandale Best shared fifty/fifty in the $1,073,605 grading cost. As graded, ninety percent of the elevation contours on the site plan are sloped toward the detention pond on Outlot A.[14]

Gaer testified Paragon Best "could not change this grading plan without going back to the City [of Urbandale] and getting their permission to do it. There's no guarantee they would have given us permission to change it." Gaer also stated it likely would cost Paragon Best another million dollars to change the grading and put the detention pond on a different site. Gaer explained any change to the storm water plan would disrupt the highly favorable agreement R&R had negotiated with the City by agreeing to the City's proposed location and funding of Plum Drive. By agreeing, Paragon Best received the City's permission to zone fifteen acres as retail and the retail-zoned property has a higher market value per square foot than when it was commercially zoned.

In July 2011, nine months before the deed, R&R unilaterally filed the Highland Pointe Office Park Plat 1 storm water management facility maintenance covenant and permanent easement agreement, which required the transfer of the storm water detention pond to the owners' association. Urbandale Best did not

---

[14] Schalekamp testified:

> Q. And if . . . a storm water detention pond [was] required by the agreed-upon site plan and planned unit development master plan that had been agreed upon by the joint venture parties, that is Kansas City Life and R&R, then that detention pond would be a necessary element of that development, would it not? A. Yes.

object to this covenant and easement agreement. Finally, the deed itself is identical to an unchallenged deed in an earlier Paragon development.

Urbandale Best now asserts it would consider spending an additional million dollars pursuing an "alternative" to a development plan that had long been in place and was significantly completed. Its assertion is unbelievable. R&R did not breach the operating agreement by executing and recording the deed to Outlot A. Rather R&R acted in conformity with its obligations under the operating agreement as the managing member.

**B. Owners' Association/CC&Rs.** With the above contract-law principles in mind, we turn to the language of the operating agreement that bears on the intent of the parties as to the owners' association/CC&Rs. Section 4.1 of the operating agreement requires the managing member, R&R, to "conduct the business of the Company on a day-to-day basis" but also to regularly consult the non-managing member, Urbandale Best, concerning "matters that may arise outside the ordinary course of business." Section 4.2 sets performance standards for the managing member, requiring it to "use all commercially reasonable efforts to efficiently, prudently, and profitably" operate the business to achieve its profit goals and a commercially reasonable return on the members' investments. And section 4.4A lists twenty-three "major decisions" which require unanimous written approval of all members, including requiring R&R to seek

approval from Urbandale Best for "any transaction not in the ordinary course of business."[15]

Urbandale Best contends (1) the *text* of the fully integrated operating agreement "best represents the parties' intent that Urbandale Best be involved in making major decisions, and (2) the Highland Pointe documents are exactly the sort of items encompassed by the major decisions" matrix. Urbandale Best points to Bartine's trial testimony that the challenged documents are agreements, create obligations, and transfer property—which qualify them as major decisions under sections 4.4A(21) and (22) of the operating agreement.

Urbandale Best is unconvincing in its reliance on a sliver of Bartine's testimony. His additional discussion concerning the parties' intent when they entered into the 2008 operating agreement does not support Urbandale Best's position. It is important to look at the parties' course of dealings in the context of the 2006 e-mail/letter agreement. *See Alta Vista Props., LLC v. Mauer Vision Ctr., PC*, 855 N.W.2d 722, 727 (Iowa 2014) (considering communications between the parties as an aid to contract interpretation). When we allow that extrinsic evidence to aid in our interpretation of the major decision matrix, we conclude both parties intended and acted to implement the prior operating agreements[16] and the challenged agreement without a hypertechnical reading of

---

[15] The record shows the content of the "major decisions" was vigorously negotiated between the parties in 2006 and remained in the revised operating agreement signed in 2008.

[16] Kansas City Life never objected to its lack of representation on the owners' association board/committee at Paragon Office Park, thus further showing the board/committee did not make major decisions and the managing member was free to operate the board/committee.

each major decision category. Rather, consistent with the general practices in the commercial real estate field, including Kansas City Life's own experiences in a prior Arizona development, the parties expected R&R to unilaterally execute documents and deeds in the ordinary course of business that are "ministerial" or "ancillary" and "necessary to make the bigger deal go forward."[17]

Bartine testified to the practical need of the managing member to be able to manage and explained the challenged documents are "excepted" from the matrix because they are "just every day ordinary course of business documents." Specifically:

> Q. And so your testimony . . . has been that if a document falls within the ordinary course of business, it's not a major decision, isn't that right? A. That would be how I see it, yes.
> . . . .
> Q. . . . [I]f you come to the determination that a document is within the ordinary course of business within section 4.4A(13) but might also fall within one of the other major decisions in section 4.4A, it's not a major decision because it doesn't apply here? A. It can't produce a ridiculous result . . . .
> Q. [Your actions were taken] because you thought these documents were within the ordinary course of business under section 13 regardless of whether they might have fallen within one of the other [major decision] sections. True or not true. A. That's true. But how important are these documents? Really, where is the materiality in these documents? Because I see these as documents that a real estate developer would put in place to control the development and drive the value up on the properties. . . . And R&R is just not going to do documents like this that are going to cause problems or decrease the value of the development period.
> Q. Even if the operating agreement requires them to do so? A. You have to look at the whole operating agreement and you have to look at the context of the negotiations and of the

---

[17] The act of notifying Urbandale Best of the recording of the documents does not change the document's status or the parties' intent upon signing the 2008 operating agreement. The other circumstances under which a Kansas City Life entity signed CC&Rs were different from the current situation. The prior circumstances involved financing and a major land swap and neither circumstance is presented herein.

relationship. And in this one you have [the 2006 email/letter agreement] floating around out there where we had this understanding. I always had this understanding with these folks.

Attorney Bartine brought more than three decades of experience in commercial real estate to his position as entity counsel. Like the district court, we find credible his opinion that the challenged documents did not constitute major decisions.

Accordingly, we find at the time the parties entered into the 2008 operating agreement, as to R&R's managerial actions, the parties intended to follow both their prior course of dealing and the customs in the commercial real estate industry. In 2008 they intended for R&R, as the sole managing member, to make managerial decisions and to take unilateral actions required in the ordinary course of business to "make the bigger deal go forward." In fact, after signing the Paragon Best operating agreement, R&R so acted without complaint by Urbandale Best.[18] We therefore conclude R&R's unilateral actions, given the parties' intended latitude for R&R as the managing member, did not constitute a breach of the 2008 Paragon Best operating agreement.[19]

**C. District Court's Sua Sponte List.** At the conclusion of its ruling, the court listed eight matters "outside the Major Decisions of Section 4.4 of the Paragon Best Operating Agreement, and within the exclusive rights and

---

[18] In 2011, R&R unilaterally prepared and signed numerous easements within Highland Pointe, a warranty deed for a road right-of-way, and an owner's consent to plat. Urbandale Best did not claim these actions were major decisions requiring its agreement before R&R could act.

[19] Because we conclude R&R's role as managing member encompassed all of the actions it took, we find no merit to Urbandale Best's claim R&R's actions violated major decision "(5) Any act in contravention of the Agreement or the Article of Organization of the Company."

responsibilities of R&R as sole Managing Member." Urbandale Best claims the actions are too broad and strip it "of all rights to participate in the management/governance of Paragon Best" including "the right to approve or disapprove the sale of lots." R&R responds the district court acted appropriately under its inherent equitable powers.

Upon our de novo review, we recognize the district court was attempting to list actions regarding plating, easements, and deeds that R&R previously had undertaken without challenge during the parties' prior course of conduct in the Paragon developments. In the spirit of judicial restraint, we vacate the court's specific list, which was not requested by R&R. Instead, we expect the parties to conduct their future business in accordance with this opinion and in accordance with their prior course of conduct in all of the Paragon developments.

## V.    Denial of Injunctive Relief

Urbandale Best filed an action alleging R&R had contravened the operating agreement, but did not seek damages. Instead the company asked for a declaratory judgment and injunctive relief. Injunctive relief is an extraordinary remedy—granted with caution and only when required to avoid irreparable damage. *Skow v. Goforth*, 618 N.W.2d 275, 277–78 (Iowa 2000). The party seeking an injunction, here Urbandale Best, bears the burden to show (1) an invasion or threatened invasion of a right, (2) substantial injury or damages will result unless an injunction is granted, and (3) no adequate legal remedy is available. *See id.* On appeal, Urbandale Best argues its claim for irreparable harm was "the loss of its contractual right to manage the business."

We reach the same result as the district court on the issue of injunctive relief, but for different reasons. In our de novo review of the record, we find no evidence that R&R's action in recording the Highland Pointe documents resulted in a material change in the managing structure envisioned by the parties when they signed the operating agreement. We are persuaded by testimony from attorney Bartine concerning the anticipated impact of the CC&Rs and the owners' association documents on the relative roles of the two members of Paragon Best. Bartine testified nothing in the CC&Rs would circumvent the major decision criteria in section 4.4A of the operating agreement. He testified regardless of the membership in the owners' association, R&R would be required to follow the operating agreement with regard to major decisions. When asked if the owners' association board or the architectural review committee could do anything to contravene Paragon Best's operating agreement, he replied: "I'm having trouble thinking through what might be a major decision that would face those people." Bartine further testified if an unexpected scenario occurred where they were faced with a major decision, he "would advise them to involve the major decision process" under the operating agreement.

Given this testimony, we conclude Urbandale Best has not met its burden to show irreparable harm in the form of losing its contractual right to manage the major decisions of the business.

## VI.    R&R's Counterclaim

The district court concluded R&R proved by a preponderance of evidence that Urbandale Best breached the operating agreement by making R&R's

performance impossible. The court based its conclusion on "actions by Kansas City Life affiliates [which] have thwart[ed] the joint ventures' success." The court also opined: "A further breach of this obligation is imminent if Urbandale Best does not allow the closing of the hotel property to proceed and the development plan for Highland Pointe Office Park to go forward." The court further determined Urbandale Best breached its duty of good faith and fair dealing and ordered the company "henceforth to act . . . consistent with its contractual obligations in the Operating Agreement for an Major Decision as interpreted by the Court." The court calculated damages based on time spent preparing for trial by R&R personnel and by Bartine and awarded R&R $23,122.50.

On appeal, Urbandale Best asserts it cannot be held responsible for the alleged actions of other affiliates of Kansas City Life, and further points out prior disputes between a different Kansas City Life affiliate, RREI, were settled and should not be considered as part of R&R's counterclaim. In addition, Urbandale Best contends its filing of this lawsuit "cannot, as a matter of law, serve as a basis for a claim of breach of the covenant of good faith and fair dealing."

R&R's counterclaim boils down to two questions: (1) Did Urbandale Best—by attempting to enforce the "major decision" provisions of the operating agreement—prevent R&R from completing its obligations? (2) Did Urbandale Best breach an implied covenant of good faith and fair dealing by filing this lawsuit? We will address each of these questions in turn.

First, R&R contends "it is a term of every contract that one party shall not prevent the other party from performing its obligations"—citing *Employee*

*Benefits Plus, Inc. v. Des Moines General Hosp.*, 535 N.W.2d 149, 155 (Iowa Ct. App. 1995). R&R is correct that our courts have recognized an implied term that one party will not prevent the other from complying with the contract conditions. But R&R obscures the consequence of that action. *Employee Benefits Plus* explains: "[I]f one party to a contract prevents the other from performing a condition or fails to cooperate to allow the condition to be satisfied, *the other party is excused from showing compliance with the condition.*" *Id.* (Emphasis added). If Urbandale Best's actions prevented R&R from complying with a term of the operating agreement, R&R would be excused from compliance with the term, but the fact of an excuse does not provide R&R with its own cause of action for breach of contract by Urbandale Best. *See id.*

Second, R&R contends Urbandale Best's decision to seek declaratory and injunctive relief constituted a breach of the implied covenant of good faith and fair dealing. R&R claims the buy-out rights and other provisions provided in the operating agreement are the sole remedies available to Paragon Best members. Both R&R and the district court reach into the business history of the two entities to support the finding that Urbandale Best was following an obstructionist strategy.

We recognize an implied duty of good faith and fair dealing in all contracts. *Bagelmann v. First Nat'l Bank,* 823 N.W.2d 18, 34 (Iowa 2012). "Good faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party." Restatement (Second) of Contracts § 205, cmt. a, at 99. "[B]ad faith may

be overt or may consist of inaction, and fair dealing may require more than honesty." *Id.* at cmt. d. When agreeing to contract, the parties enter an implied covenant not to act in a way that will destroy or injure the rights of the other party to receive the fruits of the contract. *Am. Tower, L.P. v. Local TV Iowa, L.L.C.,* 809 N.W.2d 546, 550 (Iowa Ct. App. 2011). But the implied covenant does not "give rise to new substantive terms that do not otherwise exist in the contract." *Bagelmann,* 823 N.W.2d at 34. Rather, the duty of good faith offers the parties "what they would have stipulated for at the time of contracting if they could have foreseen all future problems of performance." *Am. Tower,* 809 N.W.2d at 550.

We are skeptical that filing a lawsuit to enforce a literal reading of provisions of the operating agreement, even if that literal reading is not the interpretation ultimately given the contract by the court, could constitute a breach of the entity's duty of good faith and fair dealing. *See generally Klein v. Freedom Strategic Partners, LLC*, 595 F. Supp. 2d 1152, 1162 (D. Nev. 2009) (concluding filing a lawsuit to enforce a partnership agreement, misconstruing the agreement, and thereby frustrating the other party's ability to govern was "not a breach of the duties of loyalty and care").

We disagree with the district court's conclusion that R&R proved Urbandale Best breached the operating agreement by seeking clarification of its terms in this lawsuit. Neither do we find support in the record for the court's statement that further breach of its obligation is imminent if Urbandale Best

delays the closing of the hotel property.[20]  Accordingly, we reverse the district court's ruling on R&R's counterclaim and vacate the award of damages.

We remand for entry of an order and judgment in accord with this opinion. Costs are taxed one-half to each party.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

Doyle, J., concurs; Danilson, C.J., concurs in part and dissents in part.

---

[20] At trial, Bartine testified the hotel franchisers asked for a different configuration of the lot and that request was under discussion at the time of the trial and no closing was imminent on the hotel deal.

**DANILSON, C.J.** (concurring in part and dissenting in part).

I concur in the majority's decision to reverse the district court's ruling on R&R's counterclaim and to vacate both the damage award as well as the district court's listing of non-major decisions. I dissent in part as I would reverse the district court's denial of the relief sought by Urbandale Best.

Once the maze of complex and confusing facts is traversed, the question is whether R&R made or authorized itself to make major decisions without Urbandale Best's equal participation. Urbandale Best contends it did and thereby usurped the power of Urbandale Best to jointly make major decisions. Thus, Urbandale Best contends R&R breached the parties' operating agreement. There is no dispute that both parties invested an equal, substantial sum of funds into a joint venture and "major decisions" were to be made on a joint basis.

> As the majority noted, the operating agreement provides:
>
> Neither the Company, nor any of the Members acting alone, nor the Managing Member, shall take any of the actions (each a 'Major Decision') set out below without first obtaining the unanimous written Approval of all of the Members:
> . . . .
> (13) Any transaction not in the ordinary course of business or affairs of the Company;
> . . . .
> (21) Entering into a contract, agreement or obligation that is for longer than one (1) year, other than leases that do not require unanimous approval of all Members . . . ;
> (22) Granting or conveying any interest in property or any right to use or occupy any property other than leases that do not require unanimous approval of all Members . . . .

The dispute arose because the articles and bylaws clearly permit the transfer of real estate by the owner's association and such decisions may be made by five

directors, three individuals from R&R and two from Urbandale Best. Clearly the operating agreement requires a joint agreement for the transfer of real estate.

Urbandale Best relies upon the terms of the operating agreement to interpret the meaning of the term "major decisions" and argues that the articles and bylaws are in clear contravention of the parties' operating agreement. R&R relies upon a course of business from prior business relationships, customs of the commercial real estate business to interpret the same term, and paragraph 13 of the operating agreement to support its actions.

One problem with R&R's reliance upon a "course of business" from prior relationships is that all prior relationships dealt with different entities, although formed by some of the same principals. R&R has not provided any authority in this scenario for reliance upon the prior course of conduct of different entities.

Moreover, R&R attempts to use past history and customs of the commercial real estate business to vary unambiguous terms in the contract. Thus, the better view is that R&R is attempting to use the past course of business to support the waiver of specific terms in the parties' operating agreement. *See Margeson v. Artis*, 776 N.W.2d 652, 659 (Iowa 2009) (noting parties may waive terms of their agreement).

Further, even if the past course of conduct between the principals or the customs in commercial real estate business may be supportive of Urbandale Best's waiver of their joint decision making authority in subsequent subsidiaries' articles of incorporation and bylaws, here there was no waiver. Our supreme court has stated,

> Waiver is defined as the voluntary or intentional relinquishment of a known right. The essential elements of a waiver are the existence of a right, knowledge, actual or constructive, and an intention to relinquish such right. Waiver can be express, shown by the affirmative acts of a party, or implied, inferred from conduct that supports the conclusion waiver was intended. Generally, the issue of waiver is one for the jury; when the evidence is undisputed, however, the issue is one of law for the court.

*Iowa Comprehensive Petroleum Underground Storage Tank Fund Bd. v. Federated Mut. Ins. Co.*, 596 N.W.2d 546, 552 (Iowa 1999) (internal citations and quotations omitted).

As the majority noted, the relationship between the principal, Kansas City Life, and R&R that began in 2005 "had grown adversial," and at least one of the issues between them was R&R's sole decision to permit a design of a building in another development, a design found objectionable to Kansas City Life. As a result, the parties had discussions and negotiations regarding the meaning of "major decisions" and R&R's authority as the managing member under the instant operating agreement.

More significantly, when the articles of incorporation and bylaws were shared with Urbandale Best before their filing, Knapp responded by sending an email to Mark Rupprecht and Gaer with various redline changes intending to modify their terms to be consistent with equal participation in major decisions. However, Gaer asked attorney Bartine to prepare and file the articles and bylaws as initially prepared without the changes sought by Urbandale Best.

Under these facts, Urbandale Best did not consent to a modification of the terms of the operating agreement nor waive their applicability. Even if Kansas City Life has previously waived similar rights or authority in other development

entities, it clearly sought and put R&R on notice that it intended to exercise its authority during all stages of their relationship with perhaps one exception. I would agree R&R's execution of an easement for Outlet A for a storm water detention pool did not constitute a breach as Urbandale Best or its principals impliedly consented to R&R's action by sharing the substantial grading cost of the site plan that incorporated the storm water detention pool.

Any authority afforded to R&R to prepare and file the articles of incorporation and bylaws for the owners association because of the course of conduct of the parties, customs in the commercial real estate industry, or paragraph 13 of the operating agreement did not permit it to revise the terms of the parties' operating agreement as it did here.

I agree with Urbandale Best that the owners' association's articles of incorporation and bylaws filed by R&R have caused Urbandale Best to lose its contractual right to jointly share in the major decisions of the real estate development and it is entitled to injunctive relief.